CONFORM & RETURN

1  Brendan W. Brandt, State Bar No. 150603
   brendan.brandt@varnerbrandt.com
2  Andrew Ross, State Bar No. 205843
   andrew.ross@varnerbrandt.com
3  **VARNER & BRANDT LLP**
   3750 University Avenue, Suite 610
4  Riverside, California 92501
   Telephone: (951) 274-7777
5  Facsimile: (951) 274-7770

6  Attorneys for Plaintiffs,
   NATIONAL STANDARD FINANCE LLC
7  and WINNERS DEVELOPMENT GROUP 5, LLC

8

9              **UNITED STATES DISTRICT COURT**

10       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  NATIONAL STANDARD FINANCE<br>LLC, a Georgia limited liability<br>12  company;  and WINNERS<br>DEVELOPMENT GROUP 5, LLC, a<br>Nevada limited liability company, | CASE NO.  ED CV 13-00010 DTB |
| 13            Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| 14       vs. | 1.    **Breach of Contract**<br>2.    **Breach of Contract**<br>3.    **Breach of Implied Covenant of**<br>      **Good Faith and Fair Dealing**<br>4.    **Fraudulent Transfer**<br>5.    **Negligent Misrepsentation** |
| 15  PHYSICIANS HOSPITAL OF<br>16  DESERT CITIES LLC, a California<br>limited liability company; DESERT<br>17  CITIES HEALTH DEVELOPMENT<br>GROUP, LLC, a California limited<br>18  liability company; DESERT CITIES<br>HEALTH MANAGEMENT GROUP,<br>19  LLC, a California limited liability<br>company; GARY ANNUNZIATA;<br>20  PUNEET K. KHANNA; CARLOS<br>LOPEZ; V. DOUGLAS JODOIN;<br>21  CELESTE AMAYA; SYED AZAM;<br>AURORA BENSON; MARK<br>22  BENSON; ARVINDER BIR; SEEMA<br>BIR; RICHARD BYRD; JITKA<br>23  CIVRNA; ANH DUONG; JOHN<br>FAULKNER; MARIA GARCIA;<br>24  SCOTT GERIN; VARUN GUPTA;<br>NHAT NGUYEN-MINH; RUPINDER<br>25  MANN; MICHAEL SANFORD;<br>MURRAY TAYLOR; DALIP TIBB;<br>26  TUAN WARD; and BACHIR<br>YOUNES, | **DEMAND FOR JURY TRIAL** |
| 27            Defendants, | |
| 28 | |

Plaintiffs, by way of complaint allege:

## JURISDICTION AND VENUE

1.     National Standard Finance LLC ("NSF") is a Georgia limited liability company, having its principal place of business in Atlanta, Georgia.

2.     Winners Development Group 5, LLC ("Winners") is a Nevada limited liability company, having its principal place of business in Phoenix, Arizona.

3.     Physicians Hospital of Desert Cities LLC ("PHDC"), Desert Cities Health Development Group, LLC ("Development LLC"), and Desert Cities Health Management Group, LLC ("Management LLC") (collectively the "Hospital LLCs"), are California limited liability companies, having their principal places of business in Rancho Mirage, California.

4.     Defendants Gary Annunziata, Puneet K. Khanna, Carlos Lopez, and Doug Jodoin (collectively the "Manager Defendants") are believed to be residents of Riverside County, California. At all times relevant herein, Annunziata, Khanna, Lopez and Jodoin, acted as the sole managers of PHDC, Development LLC, and Management LLC.

5.     Defendants Celeste Amaya, Syed Azam, Aurora Benson, Mark Benson, Arvinder Bir, Seema Bir, Richard Byrd, Jitka Civrna, Anh Duong, John Faulkner, Maria Garcia, Scott Gerin, Varun Gupta, Nhat Nguyen-Minh, Rupinder Mann, Michael Sanford, Murray Taylor, Dalip Tibb, Tuan Ward and Bachir Younes (collectively the "Member Defendants") were members of PHDC, are currently members of Management LLC, and are all believed to be residents of Riverside County, California.

6.     There is complete diversity of citizenship between the parties to this action and the amount in controversy exceeds $75,000, such that this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## SUMMARY OF FACTS AND CLAIMS

8.    Defendants were, and upon information and belief still are, attempting to develop an acute care hospital in Palm Springs, California, originally through PHDC, and subsequently utilizing Development LLC and Management LLC.

9.    At defendants' request, NSF furnished a commitment to provide financing to PHDC in the amount of $309,120,580.40 in exchange for a forward conditional commitment fee of $773,801.45. Only $75,000 of the fee was paid, and defendants have refused to pay the remainder.

10.    Defendants, through PHDC, entered into an exclusive advisory agreement with Winners, which could only be terminated for cause, and, if terminated after Winners secured a financing commitment for the hospital project, entitled Winners to payment of a "Project Financing Fee," to be based upon the amount of the commitment which it secured. Notwithstanding Winners' full performance under the agreement, defendants have engaged in numerous breaches of the exclusive advisory agreement, including retaining other firms to provide essentially the same services as Winners with no notice to Winners and while Winners was still attempting to perform and shutting Winners out of the project. Defendants have refused to pay Winners anything past the initial deposits made at and around the signing of the Exclusive Advisory Agreement.

11.    Instead, defendants have transferred their business activities and assets from PHDC, which directly contracted with NSF and Winners, to Development LLC and Management LLC, without consideration, agreements or proper corporate resolution.

12.    Additionally, although the Manager Defendants represented to NSF and Winners, both orally and in writing (as well as in the private placement memorandum and operating agreement for Management LLC), that the defendants would properly capitalize their LLCs by cash pledges and/or guarantees of the Manager and Member Defendants, defendants have refused to properly capitalize the Hospital LLCs, and have otherwise disregarded the corporate structure of all of them. Consequently, all of the Manager and Member defendants are personally liable for the claims asserted herein.

**THE HOSPITAL PROJECT**

13.    The Manager and Member defendants are all doctors practicing in the Palm Springs area.  All or most of them have offices at or near the Eisenhower Hospital and/or have privileges at the Eisenhower Hospital.

14.    In or about 2010, the Manager defendants concluded that there was a need and opportunity for a fourth hospital in the Palm Springs area, and that their personal and business interests would be served by moving their practices from the Eisenhower Hospital to a newly constructed hospital.  Upon information and belief, all/or most of the Member defendants concurred in that view.

15.    As a result, defendant Annunziata and other of the Manager defendants commenced investigation and discussions toward development of a new hospital and medical office building in the Palm Springs area.

16.    The Manager defendants obtained the services of a hospital consultant, architect and a Tennessee-based law firm with some expertise in hospital development, and formed PHDC within which to structure their development activities.

17.    Through PHDC, the Manager defendants obtained an option to purchase approximately 64 acres at the intersection of Varner Road and Cook Street in Thousand Palms, California, nearly adjacent to Interstate 10 ("Thousand Palms property").

18.    Lacking the expertise to finance and construct a project of this magnitude, PHDC and the Manager defendants recognized that they would require an experienced developer in order to finance and develop any hospital on the Thousand Palms property which they had placed under option.

**THE WINNERS EXCLUSIVE ADVISORY AGREEMENT**

19.    On or about February 26, 2011, defendant Annunziata was introduced to Lee Ploszaj, a Winners employee with extensive experience in financing, developing and building major commercial properties across the United States, through an American financier based in Shanghai, China.

20.    Between February and May, 2011, Winners conducted extensive due diligence with respect to the viability of a hospital development at the Thousand Palms property, had numerous discussions with defendant Annunziata and the other Manager defendants regarding the proposed hospital development and developed a detailed structure as to how a hospital could be developed at the Thousand Palms property.

21.    In particular, in a meeting on March 18, 2011, defendant Annunziata (and subsequently all of the Manager Defendants in another meeting on March 27, 2011), represented to Winners that they had doctors "lined up" to facilitate and guarantee provision of the necessary predevelopment financing, sufficient such that permanent financing could be obtained by Winners for the hospital project.

22.    As a result of Winners' extensive due diligence, planning and structuring, the Manager defendants and PHDC solicited Winners to act as their exclusive advisor with regard to their hospital project.

23.    Relying upon the Manager Defendants' representations of having doctors "lined up" to provide the guarantees necessary to obtain predevelopment financing, Winners agreed.  Between April and May 2011, Winners' counsel and defendants' Tennessee law firm conducted extensive negotiations and exchanged drafts of an exclusive advisory agreement between PHDC and Winners.

24.    In reliance upon defendants' representations and as a result of those negotiations, on May 20, 2011, PHDC and Winners entered into an exclusive advisory agreement, a copy of which is attached hereto as Exhibit A ("Exclusive Advisory Agreement").

25.    The Exclusive Advisory Agreement provided that Winners would furnish a broad array of advisory services to defendants, inclusive of corporate advisory services, with regard to (a) predevelopment financing; (b) a permanent construction loan; (c) a purchase of the hospital or the hospital project by a third party; (d) an anticipated private placement of securities to capitalize Development LLC and Management LLC; (e) a strategic alliance with any third party with respect to the project; (f) a sale of the hospital

or the project to a third party or; (g) a sale of a portion of the hospital or the project to an investor or other third party, all of which were defined to constitute "Transaction[s]" for purposes of the agreement.

26.    Significantly, a "strategic alliance" as defined in the Exclusive Advisory Agreement included any agreement with any party contacted by PHDC or Winners during the term of the agreement "that may, either directly or indirectly, enter into any type of ownership, operating, sales, marketing and/or management agreement with" PHDC or any of its "affiliates," which was specifically anticipated to include Management LLC and Development LLC.

27.    The Exclusive Advisory Agreement expressly provided that both PHDC and Winners "must agree on which of the … activities [set forth in Paragraph 25 above] to pursue."

28.    In addition to corporate advisory services, the Exclusive Advisory Agreement also provided that Winners would furnish PHDC and its affiliates, including Management LLC and Development LLC, financial advisory services, project planning services, real estate development services, and predevelopment services.

29.    In exchange for providing such services, Winners was to be entitled to several fees, inclusive of the following:

A.    A "Predevelopment Fee" of 4% of the "total moneys to be loaned for predevelopment work," plus a "fee amount equal to 3% of the Predevelopment Costs which will be fixed upon completion of the approval of the total Predevelopment budget by [PHDC] and the lender."

B.    A "Project Financing Fee," to which Winners would be entitled in the event it "facilitate[d] securing permanent capital to provide necessary financing for the turnkey development of the hospital" from a "Covered Party," which, by definition, included NSF, pursuant to a schedule which provided that Winners would receive a 4% fee on the first $25 million, a 3.5% fee on any financing secured between $25 million and $100 million, a 3% fee on any financing secured between $100 million and $200

1  million, a 2.5% fee on any amount secured between $200 million and $300 million, and
2  2% of any amount secured by Winners over $300 million."

3          C.      A "Project Management Fee for the development and delivery of the
4  Project in an amount, calculated at 3% of the actual total final cost of the Project, plus
5  reasonable direct and indirect overhead and reimbursable expenses."

6          D.      An "Equity Equivalent Fee equal to thirty percent (30%) of the
7  amount by which the net proceeds received by [PHDC] as a result of the
8  Hospital-Related Sale exceed all acquisition, development construction and other costs
9  incurred with respect to the Project through the date of the Hospital-Related Sale
10 including, without limitation, transaction costs, filing fees and attorneys' fees, but
11 excluding this Equity Equivalent Fee due [Winners]."

12         30.     Significantly, Winners demanded and PHDC and the Manager Defendants
13 agreed that Winners would be the exclusive advisor with respect to all aspects of the
14 services that it would provide and that defendants would not engage in any such
15 activities to the exclusion of Winners.  To this end, the Exclusive Advisory Agreement
16 explicitly provided that:

17         "In order to coordinate [Winners'] efforts with respect to a possible
           Transaction during the period of [Winners'] engagement hereunder, neither
18         [PHDC nor any of its affiliates, inclusive of Management LLC or
           Development LLC] nor any representative thereof (other than [Winners])
19         will engage in discussions other than with [defendants' hospital consultant]
           or [PHDC's] legal or accounting advisors, regarding a Transaction except
20         with or through [Winners].  If [PHDC or its affiliates, inclusive of
           Management LLC or Development LLC] or its management receives an
21         inquiry regarding a Transaction, it will promptly inform [Winners] in
           writing of such inquiry."
22
23         31.     Finally, on account of the investment it would be making in this project,
24 Winners demanded and PHDC and the Manager Defendants agreed that Winners could
25 only be terminated "with cause" and after an opportunity for cure, and that Winners
26 would be paid a substantial breakup fee in the event of a termination for cause after it
27 secured construction financing for the hospital.  In this respect, the Exclusive Advisory
28 Agreement specifically provided that:

"This Agreement may not be terminated during the Term, except for "Cause" as defined herein ... Upon the expiration of such period and cure opportunity ... [i]f the terminated party is [Winners], then upon termination [PHDC] shall have no further obligation to pay [Winners] except with respect to amounts already due and payable under the Project Management Fee and [Winners] shall have no further obligation to perform any further services.  If the termination of [Winners] for Cause occurs prior to the Closing of a Hospital-Related Sale, [Winners] shall not be entitled to any portion of the Equity Equivalent Fee, **but [Winners] shall be paid the Project Financing Fee in full.**"

32.    The quoted language bolded above was actually proposed by defendants' Tennessee law firm in lieu of Winners' proposal that the breakup fee would be "based on the value of the project at termination."

33.    Based upon the agreements set forth above, Winners incurred time and expense significantly in excess of $1 million in creating multiple alternative financing structure for the project; in obtaining permanent financing for the project; in securing a bank facility to provide predevelopment financing for the project upon receipt of appropriate pledges of cash or guarantees from the Manager and Member Defendants; in assisting defendants with their public offering; in meeting with numerous parties in an attempt to raise alternative predevelopment financing after defendants reneged on their commitments to pledge cash and/or guarantees sufficient to trigger funding on the bank facility that Winners had arranged; in meeting and negotiating with potential lessees of the hospital and obtaining a letter of intent from the preferred lessee; in planning services; and in coordinating with other professionals retained by defendants for other purposes.

**THE NSF AGREEMENT**

34.    Pursuant to the Exclusive Advisory Agreement, Winners secured a commitment for permanent financing from NSF for construction of both the hospital and the medical office building that defendants wished to construct.

35.    Specifically, on June 9, 2011, NSF provided PHDC with a conditional financing commitment to advance "an amount not to exceed a gross investment of U.S. $309,120,580.40, which includes hard and soft development costs, as well as financing

costs during the 24 month construction period."  Defendant Annunziata accepted this commitment on behalf of PHDC on or about June 14, 2011.  A copy of the NSF financing commitment is attached hereto as Exhibit B.

36.    Pursuant to NSF's conditional financing commitment, NSF demanded and defendants agreed to pay NSF a standby forward purchase/investment fee of "[T]wenty-Five (25) basis points (One-Fourth of One Percent) of the stated Investment Amount and Purchase Price [and that such fee] shall be due to NATIONAL STANDARD upon acceptance of this Forward Conditional Commitment."

37.    In securing this financing commitment, PHDC and the Manager defendants, both directly and through Winners, represented to NSF that defendants would raise the necessary predevelopment financing predicate to permanent financing through the Manager and Member Defendants' personal pledges of cash and/or guarantees, on a pro rata basis, to the Royal Bank of Canada, with respect to a letter of credit facility which Winners had arranged for defendants' benefit to obtain such predevelopment financing.

38.    As a result, NSF agreed to defer payment of $698,801.45 of the $773,801.45 fee due to it until the Royal Bank of Canada facility funded pursuant to the cash pledges and personal guarantees of the Manager and Member Defendants.

39.    As discussed more fully below, defendants failed to pay NSF the remainder of its forward commitment fee, reneged upon providing nearly all of the represented pledges and guarantees to the Royal Bank of Canada, terminated the Royal Bank of Canada facility, and have advised NSF they have no intention of paying their indebtedness to NSF.

**DEFENDANTS' PREDEVELOPMENT FINANCING PLAN**

40.    The financing structure for the hospital project always contemplated and provided that no potential lease of the hospital could be obtained nor could any permanent financing be funded by any lender until defendants obtained a permit to construct the hospital from the California Office of Statewide Health Planning and Development ("OSHPOD Permit").

41.    The parties further recognized that in order to obtain an OSHPOD Permit, all of the architectural, engineering and other planning documents for the hospital had to be completed and that such predevelopment work could cost up to $25 million. At this time, defendants were alternatively/simultaneously operating as Development LLC and Management LLC, in addition to PHDC, and were attempting to raise the necessary funds through those entities.

42.    In this respect, the private placement memorandum for PHDC's successor/affiliate entities, Development LLC and Management LLC, disclosed as follows:

**"Financing Needs; Guarantees May Be Required of Members**

Development will require significant financing for working capital to secure the entitlements and Land for the Hospital Project. Development's current projections indicate that it will need approximately $25 million in working capital. If Development is unsuccessful in raising these funds in this Offering, or if it requires additional working capital, it may obtain a loan to finance its activities. In addition, Management will need additional working capital to finance its activities, and may obtain one or more loans from lenders to do so. In the event either Development or Management obtain loans, the members of Development or Management may be required to enter into pro rata guarantees of such debt. Financing may not be available upon favorable terms, and may require the members of the Companies to guarantee the debt with collateral. Pursuant to the Companies' operating agreements, if such guarantees are required to procure financing, each member will be required to provide a guarantee equal to the member's pro rata interest in the Companies. If the Companies are unable to procure the necessary financing, they will not be able to conduct their business activities."

**Liability**

The Members are protected from the general liability of the Companies except as noted in the BOC ... To the extent the Company requires working capital loans, third party financing, including leases or other obligations, to fund the business affairs of the Company, all Members shall be obligated to provide any guarantees and creditworthiness necessary for the Company to obtain such financing, on a basis pro rata to such Members' ownership in the Company, upon the approval of, and request of, the Board of Managers." (Emphasis added.)

43.    Consistent with the private placement memorandum, 3.1(a) of the operating agreement of Management LLC provides that:

"(a)    Member Guarantee Obligations.  The Company intends to secure loans or additional financing arrangements for its operating and working

capital requirements.  If required by the applicable lender, it is hereby
agreed and acknowledged that each Member and Interest Holder shall be
required to guarantee such debts or obligations of the Company based upon
their pro rata share of the issued and outstanding Units, in an amount to be
determined on the Approval of the Board of Managers and, in such event,
each Member and Interest Holder further agrees to execute and deliver such
agreements and instruments, including financial information, as the
Company may reasonably require with respect to such Member's or Interest
Holder's guarantee."

44.    Pursuant to these disclosures and operating agreements, the Manager and
Member Defendants at all times knew that without their pledges of cash or guarantees,
the Hospital LLCs would be undercapitalized and unable to pay creditor claims that may
arise.

45.    The private placement memorandum and the draft operating agreements for
Management LLC and Development LLC, all  containing an identical obligation for the
members to provide guarantees, were furnished to Winners prior to Winners' agreement
to the Exclusive Advisory Agreement.  NSF was also advised as to their essential terms.
Both Winners and NSF relied upon the representations as to the obligations of the
Manager and Member Defendants as stated in the drafts of the Management LLC and
Development LLC operating agreements provided to Winners, with respect to their
entering into and performing under their respective agreements with defendants.

46.    Pursuant to the obligations of the Manager and Member Defendants under
3.1(a) of the draft operating agreements of Management LLC and Development LLC,
Winners caused Royal Bank of Canada to establish a letter of credit facility by which the
Royal Bank of Canada would advance all predevelopment financing for obtaining the
OSHPOD Permit and other working capital needs of Management LLC and
Development LLC, upon receipt of the individual guarantees or cash pledges of the
Manager and Member defendants and the other members of these LLCs, as mandated by
the draft operating agreements.

47.    The Manager Defendants, who constituted the Board of Managers of
Management LLC and Development LLC, never required themselves or the Member
Defendants to pledge their pro rata guarantees or cash contributions sufficient to trigger

the Royal Bank of Canada's provision of predevelopment financing as represented and contemplated by the draft operating agreements, and the Management LLC operating agreement as finalized and agreed to by the Manager and Member Defendants, and the other members of Management LLC.

48. As a result, only four of the Member Defendants pledged cash or guarantees, for the aggregate amount of approximately $1.3 million, with the Royal Bank of Canada to secure the necessary predevelopment financing.

49. Moreover, as more fully explained below, defendant Annunziata – following an unrelated dispute with a Winners employee, the Royal Bank of Canada's refusal to accept the promise of letter of credit from an unidentified bank and refusal to issue a letter of credit upon inadequate documentation in a commercially unreasonable time – directed the Royal Bank of Canada to terminate its facility and remit the investments of the other Member defendants to him.

50. As a result of Management LLC's failure to require the pro rata pledges of cash and guarantees from the Manager and Member Defendants as represented to Winners and NSF, and as provided in its operating agreement, and defendant Annunziata's angry termination of the Royal Bank of Canada facility, PHDC and its successor/affiliate entities Management LLC and Development LLC were significantly undercapitalized. As a result of defendants' failure to properly capitalize the Hospital LLCs and other corporate abuses detailed above, the Manager and Member Defendants are personally liable for the obligations of PHDC to Winners and NSF.

**DEFENDANTS CREATE TWO AFFILIATE LLCS AND GUT PHDC**

51. In 2011, while defendants were conducting their development activities through PHDC, defendants learned that pursuant to the Affordable Health Care Law recently passed by Congress, doctors could not own and operate a hospital themselves.

52. As a result, defendants determined to proceed with the creation of two new limited liability companies, one of which would develop the hospital and ultimately transfer ownership of it to a third party operator, and a second LLC to provide

1    management services with respect to the hospital, Development LLC and Management
2    LLC, respectively.

3        53.    Consequently, on or about June 8, 2011, defendants completed the
4    organization of Management LLC and Development LLC.

5        54.    Plaintiffs are informed and believe that defendants never had any intent that
6    Management LLC or Development LLC would constitute separate legal entities from
7    PHDC, or one another, in any realistic manner. Rather, defendants viewed and operated
8    these entities as one and the same. For example:

9        A.    On June 21, 2011, Laurel Jacobs, purporting to be the
10   "Administrative Assistant - DCHMG/DCHDG" acting on behalf of PDHC, informed
11   PDHC's insurance broker of "a name change of the insured entity. The new name is
12   Desert Cities Health Management Group LLC...[and that PDHC had] create[d] the
13   Management Group AND Desert Cities Development Group LLC as a related vehicle
14   to raise funds to build." (emphasis added).

15       B.    On July 12, 2011, Jacobs again advised the insurance broker that "the
16   new name for [PDHC was] Desert Cities Health Management Group LLC and that:
17   We are in the process of converting the PHDC entity into the Desert Cities Health
18   Management Group LLC. This conversion is in process as the current 29 subscribers are
19   providing there [sic] written authorization to move their monies from the PHDC to the
20   DCHMG entity."

21       C.    On August 8, 2011, Jacobs, in response to "Question re: entity name
22   change for Physicians Hospital of Desert Cities," represented to the insurance broker that
23   "[t]he Board of Managers is the same for both entities."

24       D.    On August 8, 2011, Jacobs responded to questions from the insurance
25   broker asking "are the assets totally held by the Desert Cities Health Development Group
26   LLC? And is it set up as a subsidiary of Desert Cities Health Management Group LLC?
27   Or a sister entity?," by responding that the entities were "sister entities."

28

E.    In the same August 8, 2011 email, Jacobs responded to a question from the insurance broker inquiring "has there been any change in business operations as a result of the name change from Physicians Hospital of Desert Cities to Desert Cities Health Management Group?", by stating that "no change in business operations to date. We continue to recruit physician subscribers so that groundbreaking can begin."

F.    On August 9, 2011, Jacobs represented to the insurance broker that "100% assets [of PHDC] are in the Management Group at this time."

G.    On March 19, 2012, Annunziata responded to a comment from his accountant that "[t]here was some inadvertent commingling of funds as you probably know and we have effected what we feel is the intent of the offerings," by stating "the funds are not commingled. They were placed in DCHDG per vote from the shareholders to participate in the development opportunity."

H.    Management LLC and Development LLC were both controlled by the same managers, the Manager Defendants.

I.    Management LLC and Development LLC used a single offering memorandum to obtain members for both entities.

J.    Annunziata transferred monies between PHDC, Management LLC, and Development LLC without any agreement or corporate resolution.

K.    Plaintiffs are informed and believe that Management LLC and Development LLC conducted all of their business affairs through a grand total of four corporate resolutions, one of which was never signed by all its members as required.

55.    Defendants at all times treated PHDC, Management LLC, and Development LLC as a common enterprise and conducted their business as if all three were a single entity. At all operative times, Management LLC and Development LLC were operated as an integrated unit, handling different aspects of the same business with the same purpose.

56.    As of the funding and commencement of operations of Management LLC and Development LLC, PHDC had significant underpaid obligations to its lawyers,

1  development consultant, architect, NSF and Cappello Capital Corp., as well as
2  unsatisfied contractual obligations to Winners.

3       57.    Nonetheless, after the closing of the offerings for Development LLC and
4  Management LLC, defendants effectively transferred all assets of PHDC to Management
5  LLC and/or Development LLC, including:

6            a.    The option rights to the Thousand Palms property;

7            b.    All cash held by PHDC, with the possible exception of $443.43;

8            c.    All rights under UC Health's October 20, 2011 letter of intent, which
9  was memorialized by a second letter of intent between Development LLC and
10  Management LLC and UC Health on February 23, 2012;

11            d.    All rights under its agreements with the hospital consultant, architect,
12  NSF, and the Exclusive Advisory Agreement and;

13            e.    All intellectual property, other ongoing business relationships with
14  third parties and all rights to the ongoing hospital project.

15       58.    Defendants made these transfers from PHDC to Management LLC and/or
16  Development LLC without any consideration or agreement. Except for minutes as to the
17  assignment of the contracts, there was no written documentation memorializing any of
18  the transfers between the Hospital LLCs.

19       59.    Said transfer of assets amounted to an effective consolidation and/or merger
20  of the Hospital LLCs.

21       60.    As part of this transfer, the Manager Defendants offered all of the Member
22  Defendants the right to obtain interests in Management LLC at a discounted amount in
23  part by transferring their interests in PHDC. All Member defendants did so pursuant to
24  this scheme.

25       61.    As a result of these transfers, defendants denuded PHDC of all assets,
26  leaving no cash nor any other assets in PHDC whatsoever to satisfy the outstanding
27  claims of NSF and Cappello Capital Corp. and in fraud of at least both of them.

28

62.    Following these transfers, defendants simply continued the hospital development and other activities of PHDC through Management LLC and Development LLC as if they were all the same company.

63.    Additionally, after these transfers, Winners provided the services contracted for by PHDC to Development LLC and Management LLC, which all defendants accepted in support of the project and whose benefit all defendants enjoyed.

64.    As a result of the foregoing, Management LLC and Development LLC are (a) a common enterprise and effectively the same entity as PHDC, (b) successor corporations to PHDC, (c) affiliates of PHDC within the purview of the Exclusive Advisory Agreement pursuant to California Corporations Code §150 due to their common control and ownership, and (d) alter egos of PHDC and each other such that they are each responsible for all debts of PHDC, including its indebtednesses to Winners and NSF.

65.    In particular, Defendant Annunziata and the other Manager Defendants, were personally responsible for and involved in the corporate abuses set forth above, and should be considered the alter ego of all of the LLC Defendants and therefore personally liable for the obligations of PHDC.

66.    The Member Defendants (a) having authorized the transfer of all funds out of PHDC to Management LLC without consideration and without providing any assets to remain in PHDC for the benefit of its creditors, (b) having transferred their interests in PHDC to Management LLC at a discounted price, and (c) having failed to provide their personal guarantees to obtain the predevelopment financing and properly capitalize the Hospital LLC Defendants as required by the operating agreement of Management LLC and the representations of PHDC, are also the alter egos of the Hospital LLC Defendants and as such are personally liable for the obligations of PHDC.

67.    Failure to disregard the separate corporate structure of the LLC Defendants would result in an injustice as it would permit the defendants to avoid their obligations

and would reward their conduct in seeking to avoid liability for PHDC's obligations under its contracts with Winners and NSF.

## THE CHICAGO FIASCO AND DEFENDANTS' BREACH

68.    Following execution of the Exclusive Advisory Agreement, Winners engaged in extraordinary services to further the hospital project. Among other things, Winners created multiple alternative financing structures for the project; secured the permanent financing commitment from NSF for construction and development of the hospital; obtained a credit facility from Royal Bank of Canada for the necessary predevelopment funding, to occur upon appropriate pledges of cash and guarantees by the Manager and Member defendants; assisted defendants in their securities offerings and interfaced and assisted defendants' other professionals and consultants; and participated in various meetings to obtain a qualified lessee for the hospital facility.

69.    In September and October 2011, Winners made lengthy presentations to the Chief Executive Officer and upper management of UC San Diego Health Systems ("UC Health"), explaining the unique financing structure Winners had created for the hospital project to persuade UC Health to commence the process by which UC Health would serve as the lessee of the hospital to be developed.

70.    Through PHDC, on October 21, 2011, in substantial part through Winners' efforts, defendants obtained a letter of intent from UC San Diego Health Systems ("UC Health") by which defendants and UC Health would negotiate a development agreement and lease agreement by which "UCSD will lease the [hospital] Campus - including all real property, physical plant, and appurtenances - from PHDC for the purpose of operating an acute care hospital and associated medical office building. "

71.    By that same letter of intent, UC Health also agreed that "[t]he Parties will negotiate and execute an agreement ('Management Agreement') by which UCSD will secure specified management services from PHDC in support of UCSD's operation of an acute care hospital on the Campus."

72.     The UCSD letter of intent also provided defendants with a 90-day lockup period, during which UCSD agreed not to negotiate with any other group regarding development of another hospital in Riverside County.

73.     From the time of the parties' execution of the Exclusive Advisory Agreement through January 2012, Winners, NSF and defendants had a good, cooperative working relationship. For all intents and purposes up to said time, defendants complied with the terms and implied covenants of the Exclusive Advisory Agreement.

74.     In or about December 2011, Lee Ploszaj casually mentioned another Winners exclusive potential project to defendant Annunziata: the construction of a large hotel at McCormick Place in Chicago.

75.     After Ploszaj described the project to Annunziata, and advised Annunziata that the Chicago hotel project was still in need of financing, Annunziata advised Ploszaj that he had a personal relationship with a lawyer who represented the Teamsters Union in Chicago, and that the Teamsters Union might provide necessary financing with respect to the Chicago hotel project in exchange for an agreement to restrict labor on the project to Chicago Teamsters Union members.

76.     Upon information and belief, Annunziata had an agreement to obtain some fee with respect to the Chicago hotel project with the individual from the Teamsters Union with whom he placed Ploszaj in contact.

77.     Subsequently, Ploszaj had extensive discussions with various representatives of the Chicago Teamsters Union regarding various aspects of the Chicago hotel project, inclusive of the Teamsters Union providing financing for the project from its pension fund and securing licensing or permits from the City of Chicago to operate a casino at the hotel.

78.     Ultimately, the Teamsters Union representative reneged on his promises of financing from the Teamsters pension fund. The owner of the Chicago property upon which the hotel was to be constructed revealed that she actually had a judgment of

1  foreclosure which needed to be quickly satisfied in order for the project to succeed, and
2  the transaction died in or about early January 2012.

3      79.    At that stage, Annunziata became enraged with Ploszaj and refused to deal
4  with Ploszaj on the Palm Springs hospital project, although Ploszaj was the principal
5  Winners employee involved in providing services to defendants with respect to the
6  hospital project.

7  **ANNUNZIATA CRATERS THE ROYAL BANK OF CANADA LETTER OF**
8  **CREDIT FACILITY**

9      80.    While still negotiating the ultimate terms of the Exclusive Advisory
10  Agreement with PHDC, Winners structured and obtained the agreement of Royal Bank
11  of Canada to create a letter of credit facility for defendants, by which the Royal Bank of
12  Canada would provide the necessary predevelopment financing to obtain the OSHPD
13  permit and satisfy other predevelopment expenses for the hospital project, subject to
14  defendants' financial qualifications and/or personal guarantees.

15      81.    As a result of Winners' efforts, on May 11, 2011, the Royal Bank of Canada
16  forwarded Annunziata "a short word document which can be completed by each
17  participating physician" to obtain individual lines of credit, which would provide
18  collateral for a master line of credit to fund the necessary predevelopment financing for
19  the hospital project.  Royal Bank of Canada further advised Annunziata that it was
20  "staffed and prepared to move quickly [and that its] promptness relies mainly in the
21  ability of each of the partners/doctors to return documents back to us."  The Royal Bank
22  of Canada director also furnished Annunziata with his home office and cell phone
23  numbers to facilitate communications.

24      82.    As noted previously, only four Member Defendants applied for letters of
25  credit and/or furnished funds to the Royal Bank of Canada to facilitate obtaining the
26  predevelopment financing from Royal Bank of Canada.

27      83.    Remarkably, although Annunziata and the other Manager Defendants had
28  all represented that they had doctors "lined up" to provide their guarantees for the

1  financing, neither Annunziata nor the other Manager Defendants provided their own
2  guarantees or funds to facilitate the Royal Bank of Canada financing mechanism.

3      84.    Moreover, although all of the Manager Defendants, Member Defendants
4  and the other doctors who had been solicited to subscribe into the Management LLC had
5  agreed to provide their personal guarantees to secure the predevelopment financing to
6  the extent required by the lender, as the Royal Bank of Canada required to fund its letter
7  of credit facility, upon resolution of Management LLC's managers, the Manager
8  Defendants failed to require themselves, the Member Defendants or the other members
9  of Management LLC to do so - notwithstanding their prior representations to Winners
10  and NSF.

11      85.    In order to obtain the necessary predevelopment financing without requiring
12  themselves, the Member Defendants or the other members of Management LLC to honor
13  their commitments under the Management LLC operating agreement, the Manager
14  Defendants requested Winners to solicit various third parties in an attempt to
15  independently obtain the necessary predevelopment financing.

16      86.    Among other things, on November 17, 2011, after UC Health had provided
17  its initial letter of intent regarding the hospital project, Winners engaged in discussions
18  with UC Health in which UC Health expressed the possibility that it might contribute on
19  an equal basis to the predevelopment financing, if defendants or an independent investor
20  did likewise.

21      87.    Winners also solicited predevelopment financing from at least 60 other
22  institutions and investment funds either with respect to matching an investment from UC
23  Health or investment of the entire amount itself.

24      88.    None of these numerous financing sources were willing to invest all or half
25  of the necessary predevelopment financing in the absence of the defendants putting up
26  a substantial portion of the predevelopment financing themselves.

27
28

89.     At this time, Annunziata insisted that Winners and/or its own associates advance the necessary predevelopment financing themselves, although Winners had no obligation to do so.

90.     During this impasse, an associate of Annunziata, Harvey Underdahl, referred Annunziata to another purported financing broker which would supposedly obtain a reputable financial institution to provide an appropriate letter of credit to the Royal Bank of Canada sufficient to permit the Royal Bank of Canada to advance the predevelopment financing.

91.     However, upon being advised that this other broker required an upfront deposit of $1,250,000, Winners suspected the broker was fraudulent and advised Annunziata that the broker was likely conducting an illegal funding platform under investigation of the FBI and a "scam." However, at Annunziata's insistence, Winners agreed to introduce the broker to the Royal Bank of Canada.

92.     The Royal Bank of Canada requested the broker to identify the bank which would purportedly advance a letter of credit to collateralize its facility.  Annunziata's broker refused to identify any specific bank to the Royal Bank of Canada - simply representing that it would be a major bank.

93.     After the Royal Bank of Canada discovered the broker had no mailing address, and was unknown to the broker's hometown's Chamber of Commerce, Better Business Bureau or business licensing department, it also suspected Annunziata's broker was engaging in a fraud and advised Annunziata of its understanding.

94.     Because Annunziata and the other defendants had provided the Royal Bank of Canada incomplete or improperly completed documentation with respect to the letter of credit facility, the Royal Bank of Canada was unable to complete the creation of the facility as quickly as Annunziata demanded.

95.     Annunziata responded by directing a highly insulting email to Royal Bank of Canada, demanding that the Royal Bank of Canada remit all of the funds and guarantees which had been pledged by four of the Member defendants to him, and close

the facility. Although the Royal Bank of Canada advised Annunziata that it would not remit any funds or guarantees to him, since he did not own them, the Royal Bank of Canada closed the banking facility it had established to provide the predevelopment financing, and returned the pledged funds as directed by Annunziata after receiving authorization from the Member Defendants who had pledged them.

96.    Annunziata's actions and insulting of Royal Bank of Canada's personnel terminated that source of predevelopment financing for the hospital project.

97.    From there, the relationship between Winners and Annunziata soured even further. Annunziata told Winners' principal, Fred Wagenhals (Annunziata by this time refused to communicate with Ploszaj on account of the Chicago fiasco in January), that if Wagenhals or Ploszaj came to California attempting to collect any fee with respect to the project, Annunziata would "take a baseball bat to [their] head[s]," in violation of California Penal Code §§ 422(a) and 519(1).

98.    Thereafter, although Winners continued to attempt to locate sources to fund all or part of the predevelopment financing, and advised Annunziata, both orally and in multiple writings in February and March 2012, that it had located several identified and unidentified potential funding sources and requested that he meet to discuss them, Annunziata refused to meet with any of the potential financing sources or ultimately to communicate with Winners or respond to any of Winners' telephone calls or numerous letters.

99.    On March 28, 2012, defendants, through another consultant, directed Winners not to have further contact with UC Health, although such contact was essential to completion of the project, and the Exclusive Advisory Agreement specifically required that such contact occur through Winners.

100.    In July 2012, Winners solicited, negotiated with, and obtained interest from Pacific Medical Group ("Pacific"), an experienced medical facility developer, with regard to its investment and involvement in the hospital project.

101.    Pacific advised Winners that its principals had close personal relationships with UC Health and that in the event its due diligence was satisfied and UC Health still had interest in the project as reflected in its October 2011 and February 2012 letters of intent, it believed it might be able to solicit UC Health to advance the necessary predevelopment financing on an equal basis with Pacific, which Pacific was willing to do.

102.    Alternatively, Pacific indicated that if it became involved in the project even in the absence of UC Health's advancement of predevelopment financing together with Pacific, that Pacific had other sources of sharing the predevelopment financing risk and would proceed to locate such sources.

103.    Because Annunziata had refused to respond to any of Winners' phone calls or written communications for months, in order to convince defendants that it had located an appropriate potential financing source, Winners obtained a letter of interest from Pacific and furnished it to Annunziata requesting that he meet with Winners and Pacific to discuss the opportunity.

104.    Although Pacific's letter of interest stated it had recently successfully developed a nearly identical hospital in Texas and represented that it could "be in a position to contribute equity and services to the [Palm Springs hospital] project," Annunziata did not respond to the communication.

105.    The situation having deteriorated to such a degree, Winners reached out to Annunziata's associate, Underdahl, and offered to pay Underdahl a significant portion of the financing fee which Winners would have earned with respect to the NSF financing if Underdahl would facilitate a meeting between defendants, Winners and Pacific. Notwithstanding defendants' express agreement with Winners to cooperate with Winners with respect to the project, Annunziata continued to refuse to meet with Winners and Pacific to discuss the financing opportunity.

106.    Subsequently, after much prodding from Underdahl, Annunziata participated in a telephone call with a representative of Pacific, during which Annunziata

advised Pacific that the project did not require any financing from Pacific because Annunziata had already secured financing, or was in the process of arraigning it. Although that statement was false, it ended Pacific's interest in the project.

107.    Finally, in a last ditch attempt to salvage the project, Winners, through counsel, attempted to arrange a meeting with Annunziata and the Hospital LLCs to resolve any subsisting personality differences and meaningfully move the project forward as provided by the Exclusive Advisory Agreement. Annunziata and defendants continued to ignore all attempts by Winners to meet.

108.    On May 17, 2012, without any notice to Winners, Annunziata, on behalf of Development LLC, entered into an agreement with Martin B. London CPA, LLC, to provide essentially the same financing services as defendants had agreed to give Winners the exclusive right to provide in the Exclusive Advisory Agreement.

109.    On August 5, 2012, again without any notice to Winners, Annunziata, on behalf of Management LLC and Development LLC, entered into an agreement with Balfour Beatty Construction to provide essentially the same services as provided for in the Exclusive Advisory Agreement. Remarkably, that agreement provided in part that:

> "DCHDG will defend and indemnify Balfour Beatty entirely from claims or demands from Winners' Group or its employees or affiliates that Balfour Beatty breached its teaming agreement by performing the services contemplated above or otherwise induced DCHDG or its owners or affiliates to breach its or their agreement with Winners."

110.    In January 2013, defendants, through their counsel, falsely advised Winners that the project "is what is known as a 'failed deal,'" when in fact defendants were attempting to pursue the project through a transaction with UC Riverside or other arrangement, and/or obtain compensation from the project through a management agreement.

111.    Defendants have engaged in numerous additional breaches of the Exclusive Advisory Agreement by meeting and contracting with various other financing sources and other persons with respect to the hospital project to the exclusion of Winners, in express violation of the exclusivity provisions of the Exclusive Advisory Agreement.

112.   From a practical standpoint, defendants have excluded and "frozen out" Winners from the hospital project yet have never terminated the Exclusive Advisory Agreement, for cause or otherwise, as required by the Exclusive Advisory Agreement.

113.   As stated, defendants have also advised NSF that it will not pay NSF the remainder of its forward commitment fee, although the Royal Bank of Canada financing only failed to fund because the Manager and Member Defendants refused to pledge cash and/or guarantees on a pro rata basis to Royal Bank of Canada, as represented to NSF and as provided for in the Management LLC operating agreement, and because Annunziata terminated the Royal Bank of Canada facility, thereby preventing the occurrence of the condition precedent to NSF's payment.

## FIRST CLAIM FOR RELIEF

### (NSF Against All Defendants - Breach of Contract)

114.   Plaintiffs repeat each preceding allegation of this complaint as if set forth in their entirety herein.

115.   By its Forward Conditional Commitment #09062011, Purchase & Investment Agreement of June 9, 2011 (the "NSF Commitment," attached as Exhibit B), NSF furnished PHDC with a commitment "to invest in the development costs of the proposed Property in an amount not to exceed a gross investment of U.S. $309,120,580.40" subject to stated conditions typical in a financing of this type. The NSF Commitment, upon acceptance, had substantial value to PHDC for numerous reasons. For example, a financing commitment of this magnitude gave defendants significant credibility in dealing with third parties in attempting to develop the hospital, such as positioning PHDC to attract genuine interest from potential lessees like UC Health and to obtain additional doctors to join the project. In fact, Development LLC and Management LLC touted the NSF Commitment in their private placement memorandums in attempting to attract new members. For all intents and purposes,

1  without this financing commitment the defendants were little more than a group of
2  doctors who had an idea and the hope to develop a hospital..

3      116.   In exchange for this commitment, PHDC agreed to pay NSF a standby
4  forward purchase/investment fee of "Twenty-Five (25)" basis points (One-Fourth Of One
5  Percent)  of  [$309,120,580.40]"  which  amount  "shall  be  due  to  NATIONAL
6  STANDARD upon acceptance of this Forward Conditional Commitment." Such a fee
7  was typical and customary in transactions of this type.

8      117.   Pursuant to the NSF Commitment, NSF was entitled to be paid the amount
9  of $773,804.10 as its standby forward purchase/investment fee.

10      118.   At PHDC's request, NSF agreed that $75,000 was due upon execution of the
11  NSF Commitment, with the balance due upon completion of the predevelopment budget
12  funding by Royal Bank of Canada.

13      119.   PHDC paid NSF the initial $75,000, leaving a balance due and payable to
14  NSF of $698,804.10. Defendants prevented the satisfaction of the condition precedent
15  by failing to cooperate with Royal Bank Canada. Despite the representations of PHDC,
16  Management LLC and Development LLC, the Manager and Member defendants failed
17  to pledge the cash and/or guarantees required by Royal Bank of Canada, pro rata to their
18  investments,  as  required  by  the  operating  agreements  for  Management LLC  and
19  Development LLC, and subsequently defendant Annunziata terminated the Royal Bank
20  of Canada facility over its refusal to deal with a broker it reasoned to be fraudulent and
21  complete  a  letter  of  credit  facility  upon  insufficient  documentation  and  within  a
22  commercially insufficient amount of time.

23      120.   NSF has performed all conditions, covenants, and promises required by it
24  to be performed in accordance with the terms and conditions of the NSF Commitment.

25      121.   PHDC is liable to NSF in the amount of $698,804.10.

26      122.   As set forth in detail above, Management LLC and Development LLC are
27  the successor/affiliate/alter egos of PHDC and as such are liable to NSF in the amount
28  of $698,804.10.

123.   As set forth in detail above, the Manager Defendants are the alter egos of PHDC and as such are liable to NSF in the amount of $698,804.10.

124.   As set forth in detail above, the Member Defendants are the alter egos of PHDC and as such are liable to NSF in the amount of $698,804.10.

125.   Failure to disregard the corporate structure of the defendants in this matter would result in an injustice to NSF as it would permit the defendants to avoid their obligations and would reward their conduct in seeking to avoid liability for PHDC's obligations under its contract with NSF.

### SECOND CLAIM FOR RELIEF

### (Winners Against All Defendants - Breach of Contract)

126.   Plaintiffs repeat each preceding allegation of this complaint as if set forth in their entirety herein.

127.   The Exclusive Advisory Agreement provided that Winners could only be terminated "for cause" and after a notice of breach and opportunity to cure such breach. It also provided that even upon a termination "for cause," Winners would be entitled to receive the Project Financing Fee in full.

128.   Winners has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the Exclusive Advisory Agreement.

129.   PHDC has breached the Exclusive Advisory Agreement (Exhibit A) in numerous ways:

A.   PHDC breached its obligation "to cooperate with [Winners] (Exhibit A, page 9) by refusing to meet with Winners, refusing to respond to Winners' phone calls, refusing to respond to Winners' written communications, refusing to meet with financing sources which Winners had developed, directing Winners to terminate contact with UC Health, refusing to cooperate with Winners, by defendant Annunziata's threats of physical violence in violation of Penal Code §§ 422(a) and 519(1), by effectively terminating Winners from the project without notice or any opportunity to cure, and by

1  contracting with Balfour Beatty Construction and Martin B. London CPA, LLC, to
2  provide essentially the same services as Winners was contracted to provide, without
3  notice to Winners or termination of the Exclusive Advisory Agreement for cause.

4          B.    PHDC breached its obligation "to undertake the obligations imposed
5  upon [PHDC] hereinunder or pursuant to other agreements in connection with the
6  development of the Project" (Exhibit A, page 9) by refusing to require the Manager and
7  Member Defendants to pledge cash or guaranties to collateralize the Royal Bank of
8  Canada facility, or cooperate with other potential financing sources for the Project,
9  making it impossible to obtain the necessary predevelopment money to enable the project
10  to be completed; and

11          C.    PHDC breached its obligation not to "engage in discussions, other
12  than with [their hospital consultant] or [PHDC's] legal or accounting advisors, regarding
13  a Transaction except with or through [Winners]" (Exhibit A, page 7), by excluding
14  Winners from communication with UC Health and contracting with Balfour Beatty
15  Construction and Martin B. London CPA, LLC.

16      130.   These actions and omissions made it impossible for Winners to continue its
17  performance under the Exclusive Advisory Agreement, and effectively wrecked the
18  project.

19      131.   Had PHDC properly complied with the exclusive advisory agreement,
20  Winners would have earned: a Predevelopment Fee of approximately $1,750,000; a
21  Project Financing Fee in the amount of $9,307,415 pursuant to the financing it obtained
22  from NSF;  a Project Management Fee of approximately$8,000,000; and an Equity
23  Equivalent Fee of approximately$13,500,000, for total estimated fees of $32,057,415.

24      132.   PHDC is liable to Winners in the amount of approximately $32,057,415, as
25  will be proven at trial.

26      133.   As set forth in detail above, Management LLC and Development LLC are
27  the successor/affiliate/alter egos of PHDC and as such are liable to Winners in the
28  amount of approximately $32,057,415, as will be proven at trial.

134.   As set forth in detail above, the Manager Defendants are the alter egos of PHDC and as such are liable to Winners in the amount of approximately $32,057,415, as will be proven at trial.

135.   As set forth in detail above, the Member Defendants are the alter egos of PHDC and as such are liable to Winners in the amount of approximately $32,057,415, as will be proven at trial.

136.   Failure to disregard the corporate structure of the defendants in this matter would result in an injustice to Winners as it would permit the defendants to avoid their obligations and would reward their conduct in seeking to avoid liability for PHDC's obligations under its contract with Winners.

**THIRD CLAIM FOR RELIEF**

**(Winners Against All Defendants - Breach of the Implied Covenant of Good Faith and Fair Dealing)**

137.   Plaintiffs repeat each preceding allegation of this complaint as if set forth in their entirety herein.

138.   PHDC had an implied obligation of good faith and fair dealing to cooperate with Winners in completing the hospital project in the most economically advantageous manner, to not freeze Winners out of the project, nor to attempt to terminate Winners' exclusive advisory agreement without providing notice of breach and an opportunity to cure.

139.   PHDC violated its obligation of good faith and fair dealing by refusing to cooperate with Winners; by wrecking the project without notice to Winners; by contracting with other firms to provide essentially the same services as Winners without notice to Winners; by falsely asserting to Winners that the hospital project had "failed" when (through Management LLC and Development LLC) it was actively pursuing the hospital project with the UC Riverside School of Medicine; and by effectively terminating Winners without notice or the opportunity to cure any alleged breach, with

the intent to deprive Winners of receiving its Project Financing Fee, to which it was entitled to be paid in full upon any termination for cause.

140.    PHDC is therefore liable to Winners for damages for its breach of the implied covenant of good faith and fair dealing, in the amount of $32,057,415.

141.    As set forth in detail above, Management LLC and Development LLC are the successor/affiliate/alter egos of PHDC and as such are liable to Winners in the amount of approximately $32,057,415, as will be proven at trial.

142.    As set forth in detail above, the Manager Defendants are the alter egos of PHDC and as such are liable to Winners in the amount of approximately $32,057,415, as will be proven at trial.

143.    As set forth in detail above, the Member Defendants are the alter egos of PHDC and as such are liable to Winners in the amount of approximately $32,057,415, as will be proven at trial.

144.    Failure to disregard the corporate structure of the defendants in this matter would result in an injustice to Winners as it would permit the defendants to avoid their obligations and would reward their conduct in seeking to avoid liability for PHDC's obligations under its contract with Winners.

## FOURTH CLAIM FOR RELIEF

### (NSF Against the Manager Defendants - Fraudulent Transfer)

145.    Plaintiffs repeat each preceding allegation of this complaint as if set forth in their entireties herein.

146.    As of June 14, 2011, PHDC owed NSF $698,804.10. PHDC likewise was indebted in a substantial amount to the Cappello Group, and had potential contractual liabilities to Winners.

147.    As of June 14, 2011, NSF was a "creditor" of PHDC within the purview of Civil Code § 3439.01(c).

148.    As of June 14, 2011, PHDC was a "debtor" to NSF within the purview of Civil Code § 3439.01(e).

149.  After June 14, 2011, PHDC effectively transferred its option rights to the Thousand Palms property, when Annunziata, on behalf of Development LLC entered into an option agreement with the Berger Foundation for the same property.  This agreement effectively transferred all rights of PHDC to develop the hospital to Development LLC and/or Management LLC. These rights constituted "assets" of PHDC within the purview of Civil Code § 3439.01(a).

150.  As of June 21, 2011, PHDC was in the "process of moving all" of its funds to Management LLC, with the result that as of August 29, 2011, only $443.43 remained in PHDC.  Upon information and belief, the amount of funds transferred out of PHDC to Development LLC and/or Management LLC totaled $1,135,000.

151.  As of August 9, 2011, with the possible exception of the $443.43 which remained in PDHC as of August 29, 2011, PHDC had transferred all of its assets to Management LLC or Development LLC, such that "100% assets [of PHDC] are in the Management Group at this time."

152.  As a result of these transfers, PHDC was rendered insolvent within the purview of Civil Code § 3439.02.

153.  Neither Management LLC nor Development LLC paid any consideration to PHDC in exchange for any of the assets it received from PHDC.

154.  The foregoing transfers of assets out of PHDC to Management LLC and Development LLC were fraudulent as to NSF pursuant to Civil Code § 3439.05.

155.  As PHDC could only act through its managers, upon information and belief, all of the Manager Defendants approved of all transfers of assets out of PHDC, authorized such transfers and as such are personally responsible for making such transfers, directly, as conspirators and/or aiders and abettors.

156.  NSF is entitled to appropriate remedies against PHDC, Management LLC and Development LLC, and the Manager Defendants as provided by Civil Code §3439.07.

157.   NSF is entitled to damages against against PHDC, Management LLC and Development LLC, and the Manager Defendants in the amount of $698,804.10.

### FIFTH CLAIM FOR RELIEF

**(Winners Against The Manager Defendants - Negligent Misrepresentation)**

158.   Plaintiffs repeat each preceding allegation of this amended complaint as if set forth in their entireties herein.

159.   On March 18, 2011, defendant Annunziata met with Wagenhals and Ploszaj, who attended the meeting on behalf of Winners, at the Tommy Bahama restaurant in Scottsdale, Arizona.   Annunziata's associate, Harvey Underdahl, also attended the meeting.

160.   At that meeting, Annunziata and Underdahl solicited Wagenhals and Ploszaj to enter into a transaction with PDHC, by which Winners could facilitate PDHC's financing of the hospital development.

161.   During the course of that meeting, Annunziata and Underdahl described the hospital project, its history and disclosed the necessity for obtaining an OSHPD permit to facilitate the hospital development, and its approximate cost.

162.   From their knowledge of the financing requirements of similar type developments, Wagenhals and Ploszaj advised Annunziata and Underdahl that it would be highly unlikely, if not impossible, to arrange permanent financing for the hospital, unless they and their group were able to provide the pre-development financing.

163.   In response, Annunziata represented to Winners, through Wagenhals and Ploszaj, that he had doctors "lined up" to directly contribute, or guarantee the necessary borrowing for, any financing which might be required to obtain the OSHPD permit and fund other essential pre-development expenses.

164.   Based upon Annunziata's representation, Wagenhals and Ploszaj concluded the development and financing of the hospital project to be feasible and scheduled another meeting to meet again with Annunziata, together with the other Manager defendants in Palm Springs.

165. On March 27, 2011, Wagenhals and Ploszaj met with Annunziata, Khanna, Lopez and Jodoin at Fleming's Prime Steakhouse and Wine Bar in Rancho Mirage, California.

166. During the course of that meeting, the parties again discussed that without the ability of the doctors to fund acquisition of the OSHPD permit and other pre-development financing, it would be highly unlikely, if not impossible, to obtain permanent financing for the project.

167. In response, Annunziata, Khanna, Lopez and Jodoin all represented to Wagenhals and Ploszaj that they had a group of doctors "lined up" to directly contribute, or provide the necessary guarantees for a loan to obtain, the essential pre-development financing.

168. Indeed, on May 23, 2011, Annunziata made a virtually identical representation, i.e. that "[t]he doctors are going to guarantee the pre development capital," to the director of the Berger Foundation (which owned the Thousand Palms property), in an email copied to Ploszaj, the other Manager defendants and others.

169. The representations of Annunziata, Khanna, Lopez and Jodoin that they had doctors "lined up" to directly contribute, or provide guarantees for a loan to obtain the essential pre-development financing was material and essential both to obtaining financing and as to Winners' participation in the project at all, because in the absence of such guarantees (or some other source of funds to obtain the pre-development financing) permanent financing in the amounts required would be impossible to obtain and the project could not proceed.

170. The representations of Annunziata, Khanna, Lopez and Jodoin that they had doctors "lined up" to directly contribute, or provide the necessary guarantees for, the predevelopment were untrue and were made by them without any reasonable basis to believe those representations to be true. Among other things:

A.     No documentation in defendants' files indicate that any member of PDHC, or any other doctor with whom defendants had been in contact, had ever agreed to provide any guarantees - or had even been contacted regarding such guarantees.

B.     Subsequent meetings with the members of PDHC, and other doctors with whom Annunziata and the other doctor managers had been in contact, indicated that they had never been contacted or knew of the concept of providing guarantees.

C.     Ultimately, only four doctors provided guarantees in a letter of credit facility which Winners had arranged pursuant to defendants' representations of the doctors' willingness to provide personal guarantees, and

D.     None of Annunziata, Khanna, Lopez and Jodoin ever provided their own personal guarantees - notwithstanding their earlier representations.

171.   Annunziata, Khanna, Lopez and Jodoin made their representations to Winners that they had doctors "lined up" to either directly contribute, or guarantee, the predevelopment financing with the intent that Winners rely on such representations in agreeing to obtain permanent financing for, and otherwise assist in, the hospital project.

172.   Winners in fact relied upon the representations of Annunziata, Khanna, Lopez and Jodoin in entering into its exclusive advisory agreement with PHDC and in expending over $1 Million in time and expense pursuant to that contract. In the absence of defendants' representation as to having doctors "lined up" to directly contribute or provide guarantees for the pre-development financing, Winners would have never contracted with PDHC, nor expended any time or energy on its behalf.

173.   Annunziata, Khanna, Lopez and Jodoin knew or should have known that their representations to Winners that they had doctors "lined up" to provide guarantees were false either because they made the statements without sufficient basis or they were negligent in the manner in which they communicated their representations to Winners.

174.   As a result of their misrepresentations, defendants Annunziata, Khanna, Lopez and Jodoin are liable to Winners in damages in an amount to be fixed by the jury.

WHEREFORE, Plaintiffs demand:

1        A.    Damages in the amount of $698,804.10 against all defendants in favor

2   of NSF;

3        B.    Damages in the amount of $32,057,415 against all defendants in favor

4   of Winners;

5        C.    That NSF obtain such remedies as may be appropriate under Civil

6   Code § 3439.07 pursuant to the Fourth Claim for Relief;

7        D.    Such other compensatory damages against all defendants in an

8   amount to be proven at trial;

9        E.    An award of attorneys' fees in favor of Winners against all defendants

10  pursuant to the Exclusive Advisory Agreement;

11       F.    Costs of suit; and

12       G.    For whatever further relief may be proper under the circumstances.

13

14  DATED: July 31, 2013          VARNER & BRANDT LLP

15

16                         By:   /s/ Brendan W. Brandt

17                            Brendan W. Brandt, Esq.
                              Attorneys for Plaintiffs,

18                            NATIONAL STANDARD FINANCE LLC and WINNERS DEVELOPMENT

19                            GROUP 5, LLC

20                      RUSSELL PICCOLI, PLC

21

22                         By:   /s/ Russell Piccoli
                              Russell Piccoli

23                            701 North 44th Street
                              Phoenix, Arizona 85008

24                            Pro Hac Vice Counsel for Plaintiffs

25

26

27

28

---

1

## DEMAND FOR JURY TRIAL

2

3      Plaintiffs again demand a jury trial pursuant to Federal Rule of Civil Procedure 38

4  and Local Rule 38-1.

5

6

7  DATED: July 31, 2013                    VARNER & BRANDT LLP

8

9                                          By:    /s/ Brendan W. Brandt
                                                  Brendan W. Brandt, Esq.
10                                                Attorneys for Plaintiffs,
                                                  NATIONAL   STANDARD   FINANCE
11                                                LLC and WINNERS DEVELOPMENT
                                                  GROUP 5, LLC
12

13                                         RUSSELL PICCOLI, PLC

14

15                                         By:    /s/ Russell Piccoli
                                                  Russell Piccoli
16                                                701 North 44th Street
                                                  Phoenix, Arizona 85008
17                                                Pro Hac Vice Counsel for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

May 25 11 06:25p     GA                                    76/   )-8857                p.1

May 20, 2011


Gary Annunziata, D.O.
Chair of the Board of Managers
Physicians' Hospital of Desert Cities, LLC
35900 Bob Hope Drive #275
Rancho Mirage, CA 92270

Dear Gary:

This letter shall confirm the engagement of Winners Development Group 5, LLC, a Nevada limited liability company ("Advisor") as the exclusive corporate and financial advisor and non-exclusive real estate development program manager to perform certain advisory services and the real estate development services that Physicians' Hospital of Desert Cities, LLC or its assignee ("PHDC" or the "Company," which terms shall include all affiliates and subsidiaries) requires in connection with the successful development and construction of a new hospital campus (including a general acute care hospital (the "Hospital") to be located on approximately 64 acres at the intersection of Varner Road and Cook Street in Thousand Palms, California (the "Property"). Acquisition, development, and construction of the Hospital and the real property associated with the Hospital shall be referred to herein as the "Project." We understand that PHDC presently has the Property under contract; we understand further that due to regulatory restrictions on PHDC's ownership and operation of a hospital, the Company intends to sell the Hospital (a "Hospital-Related Sale") once (i) entitlement is completed as confirmed through the issuance of a California Office of Statewide Health Planning & Development ("OSHPD" ) permit, and (ii) execution of a credit lease instrument with a mutually acceptable credit tenant (the "Tenant") (of which will be required) to consummate the sale to a hospital investor. The Company may also elect to separately develop a Medical Office Building ("MOB") on the Property and that portion of the Property that is not used in the construction of the Hospital. Development of the MOB and development of that portion of the Property not used in the construction of the Hospital shall not be included in the Project as outlined in this Agreement. However, if Company chooses to use the financing arranged by Advisor and project management services for development of an MOB, Advisor shall be entitled to a financing fee and project management fee to be agreed upon separately by the parties but consistent with terms and fees set forth in this Agreement..

The term of this Agreement shall run from the date of receipt by Advisor of the Company's signed acceptance of this Agreement until completion of the Project currently projected to be a minimum of 36 months thereafter, and will then automatically extend on a month-to-month basis if necessary until cancelled by either party pursuant to the terms hereof ("Term").

1

May 25 11 06:25p    GA                                        76·  0-8857                p.2

I. Corporate Advisory Services:

The corporate advisory services that may be performed by the Advisor relate to the following types of Transactions with one or more entities introduced or identified by or on behalf of Advisor or Company, or who is in contact with or is contacted by Advisor or Company during the Term of the Agreement (individually or collectively, a "Covered Party"). For avoidance of doubt, all of the parties set forth on **Exhibit A**, which by this reference is incorporated herein, shall be deemed a Covered Party. Exhibit A may be amended from time to time by Advisor to include other parties that shall be deemed a Covered Party. Both the Company and the Advisor must agree on which of the following activities to pursue. As used in this Agreement, the term "Transaction" shall include, but specifically not be limited to or by:

   a) a loan from a lender to the company to be used to finance the initial development of the Property ("**Pre-Development Financing**");

   b) a loan from National Standard Finance or an affiliated party ("NSF") to a suitable investor and/or operator of the Hospital or other purchaser to be used to develop or purchase the Hospital ("**Permanent Loan**");

   c) a purchase or pre-purchase by NSF, or by another purchaser of the Hospital;

   d) a private placement, conducted pursuant to Regulation D of the Securities Act of 1933 or other applicable U.S. or foreign securities laws, rules and regulations with a Covered Party (a "**Private Placement**") including, without limitation, a placement of Company equity, debt, convertible securities or other financial instrument in such amount as the Company and the Advisor may agree upon. For purposes of this Agreement, "**Placement Amount**" shall mean, exclusive of warrants or other equity issued to Advisor, the amount raised in a Private Placement. Our services regarding a Private Placement do not constitute a firm underwriting or guaranty of raising any specific amount of capital, and we will not be required to engage in activities that would constitute acting as a broker or dealer as such terms are defined in any applicable state or federal securities laws;

   e) a strategic alliance (a "**Strategic Alliance**") that involves an agreement with a Covered Party that may, either directly or indirectly, enter into any type of ownership, operating, sales, marketing and/or management agreement with the Company;

   f) the sale of the Company (a "**Sale**" or "**Merger**"), whether by (i) merger, (ii) reverse merger, (iii) stock sale, or (iv) sale in one or more transactions of all or substantially all of the assets of the Company to a Covered Party, other than a Private Placement, including without limitation any Transaction in which the shareholders of the Company own less than a majority of the surviving entity or, in the case of a merger or sale with or to a shell company or a special purpose acquisition corporation (SPAC), irrespective of the resulting division of ownership;

   g) the sale of a portion of the Company not defined as a Sale or Merger (a "**Divestiture**"), whether by merger, stock sale or sale in one or more transactions, of a portion of the

2

assets of the Company to a Covered Party:

h) the sale of all or part of the Project to a suitable investor and/or operator of the Hospital or other purchaser.

## Description of Financial Advisory Services:

The Advisor will, to the extent requested by the Company, assist the Company in analyzing potential Transactions according to the terms and conditions of this Agreement. In this regard, the Advisor may undertake certain activities on behalf of the Company, including the following:

a) analyzing Transaction options available to the Company;

b) counseling the Company as to strategy and tactics for effecting a potential Transaction;

c) advising the Company as to the structure and form of a possible Transaction, including the form of any agreements related thereto;

d) assisting the Company in obtaining appropriate information and in preparing due diligence presentations related to a potential Transaction;

e) introducing the Company to such Covered Parties as institutional investors, lenders, strategic or financial buyers, distributors, licensees, and/or strategic partners, as may be appropriate;

f) assisting in negotiations related to a potential Transaction, as may be appropriate, on behalf of the Company; and

g) rendering such other advisory services as may from time to time be agreed upon by the Company and the Advisor.

## Compensation for Corporate and Financial Advisory Services:

The Company paid and delivered to Advisor on May 20, 2011, the sum of $50,000 as the Company's **"Initial Fee"** for its services under this Agreement. Within eight (8) weeks of execution of this Agreement, Company shall pay to Advisor an additional sum of $50,000 as the Company's **"Secondary Fee"** for its services under this Agreement. Upon the earlier occurrence of the first draw of the Pre-Development Financing available to the Company or August 15, 2011, Company shall pay to Advisor an additional sum of $100,000 as the Company's **"Tertiary Fee"** for its services under this Agreement. The Initial Fee, Secondary Fee, and Tertiary Fee shall be deemed fully earned upon receipt, and nonrefundable. In addition, Advisor shall also be entitled to additional fees and compensation as set forth in this Agreement, including for any capital loaned for or invested in the Project by a Covered Party. Advisor shall not be entitled to any fee in connection with the completion of the syndication for PHDC or a private placement offering for Desert Cities Health Management Group, LLC.

3

## II. Real Estate Development Services:

In addition to the advisory services outlined above, Advisor shall also provide real estate development services described in this section.

### Project Development/Program Management Services under a "Turnkey Delivery Model":

As soon as practical after the date hereof, Advisor shall work with the company PHDC has contracted with to provide hospital development services, Healthcare Development Group, LLC ("HDG"), to prepare and maintain a list of steps to be taken for land acquisition, finance planning, entitlement objectives, overall site development strategy, lease or sale negotiations of the underlying lands and the physical improvements of the Hospital, capital structuring for the Project, together with a Master Development schedule for the completion thereof, which shall be attached hereto as **Exhibit B** and incorporated herein ("**Project Master Development Schedule**") within thirty (30) days of execution of this Agreement and shall be subject to the approval of the Company  The Project Master Development Schedule shall indicate the dates for the start and completion of the various stages of the Project, including the dates when information and approvals are required from the Company and including the Project date of substantial completion (the "**Completion Date**") of all of the services required to be performed to complete the Project (the "**Work**").  The Project Master Development Schedule shall be revised by Advisor as required by the conditions of the Project.  Throughout the planning, design, financing, equipping, construction and development of the Project, Advisor shall act, in close coordination with and at the direction of Company, as Company's key representative with respect to dealings with the Project lenders, partners, developer, architect, contractor, equipment suppliers, tenants and vendors, and HDG. Without limiting the scope and description of services to be provided by Advisor as more fully described on Exhibit B, Advisor will provide the following services:

### Project Planning Services:

Upon final review of the operating procedures, staffing assumptions, and facility plan, Advisor will work with Company, the operator/management company selected by Company for the Project, and HDG to incorporate any comments and changes and refine the Single-Line Planning Documents ("SLPDs") accordingly prior to completion of architectural and engineering services. Advisor will work with the current and contracted architect of record for the project, Davis Stokes Collaborative, PC ("DSC"), and will work with the Project's current contracted development manager, HDG, whereby Advisor will act as the Company's representative in coordinating activities with the development manager, architect and the general contractor all under a turnkey development approach.  Advisor will review with Company all material construction documents submitted by the architect and development manager for review and recommendation by Advisor for Company's approval by stage of completion, along with invoices, bills, change orders (in excess of an agreed-upon amount) and other documents generated in connection with the Project.  Advisor will also coordinate all material ancillary required services directed by the development manager and architect , including but not limited

4

to soils testing, environmental testing, special testing, systems compliance requirements, utilities evaluation and analysis, and other services

## Pre-Development Services

Advisor will assist Company in securing financing for all Pre-Development services for the Project which include all services required to receive issuance of the OSHPD permit and a Permanent Loan ("Pre-Development Services"). Advisor will introduce potential lenders to Company and its members and facilitate securing the Pre-Development Financing. For such services, Advisor shall be paid a fee pursuant to the attached schedule set forth on Exhibit C as a percentage of the total monies to be loaned for pre-development work to be paid at Closing of the Pre-Development Financing. In addition, the Advisor shall work with HDG during the pre-development period anticipated to not be shorter than eighteen months 18 months (the "Pre-Development Period") to coincide with the permitting process by OSHPD and provide certain pre-development services and oversee the work set forth in Exhibit B. The Advisor shall also be paid all of its reasonable Direct Reimbursable Expenses as such expenses are set forth and approved in the Pre-Development Budget approved by the company and Advisor. If such expenses are to exceed the expenses set forth in the budget, the Advisor shall receive the prior written approval from the Company. In addition, Advisor shall receive a fee amount equal to 3% of the Predevelopment costs which will be fixed upon completion of the approval of the total Pre-Development budget by Company and the lender (collectively, "Pre-Development Fee"). The Pre-Development Fee shall be set forth by Company and Advisor and incorporated into the Pre-Development Financing. The Advisor's Pre-Development Fee shall be paid to the Advisor, with the monthly amount based on the total projected Pre-Development Fee and dividing it by the months projected to completion of the pre-development period. The Pre-Development Fee shall commence upon execution of this Agreement and until the Pre-Development Financing is secured the Pre-Development Fee shall be accrued and the fee accrued prior to the Pre-Development Financing shall be paid at the closing of the Pre-Development Financing.

## Compensation for Development Services:

1.      Advisor shall facilitate securing permanent capital to provide necessary financing for the turnkey development of the Hospital with the expectation that a buyer would purchase the Property or Project upon completion of the pre-development work or sooner (the "Funding"). As part of this Agreement and as a condition of the transaction with the Hospital, Advisor shall be paid by Purchaser in the Hospital-Related Sale the following:

(i) If the Funding is provided by or the purchase is by a Covered Party, a fee as set forth in the attached Exhibit C, which fee is a percentage of the total financing provided for the development or purchase of the Hospital (the "Project Financing Fee"). Such fee will be paid at the applicable percentages set forth in Exhibit C corresponding to the incremental amounts of financing listed on such Exhibit. Such amount shall be paid to Advisor at Closing of the Funding;

5

(ii) A Project Management Fee for the development and delivery of the Project in an amount, calculated at 3% of the actual total final cost of the Project, plus reasonable direct and indirect overhead and reimbursable expenses. For purposes of this Agreement, reimbursable expenses shall be Advisor's reasonable out of pocket costs related to and necessary in connection with completion of the Project including direct and indirect overhead. These fees shall all be part of the overall total Project development budget. The Program Management Fee shall be billed by Advisor on a monthly or periodic basis proportionate to the percentage of work complete for each phase of the Project. The Project Management Fee shall accompany each draw approved by the architect of the Project and submitted to lender of the Permanent Loan for payment.

2.    In addition to the above referenced compensation for development services, at such time as the Company consummates a Hospital-Related Sale to a Covered Party or a party funded by a Covered Party, the Advisor shall receive an additional fee referred to herein as the Hospital development "Equity Equivalent Fee". This fee will be paid either directly by the Covered Party, a party funded by a Covered Party, or, if acceptable to the Advisor, by the Company after the proceeds of the Hospital-Related Sale are paid to the Company. This fee will be equal to thirty percent (30%) of the amount by which the net proceeds received by the Company as a result of the Hospital-Related Sale exceed all acquisition, development, construction and other costs incurred with respect to the Project through the date of the Hospital-Related Sale, including, without limitation, transaction costs, filing fees and attorney fees, but excluding this Equity Equivalent Fee due Advisor. The parties hereby acknowledge and agree that the remaining seventy percent (70%) of such excess amount will be paid to (or retained by) the Company in consideration for the risks associated with the development of the Project assumed by the Company and the Company's work in the development of the Hospital. This fee shall be paid at closing upon successful completion of the project and upon acceptance of title by the purchaser.

### III. Other Matters:

**Assignment:**

It is contemplated that all of the rights, duties and obligations of the Company under this Agreement may be assigned by Company. It is agreed that such an assignment shall require the prior written consent of Advisor, which consent shall not be unreasonably withheld by Advisor. Upon the assignment of this Agreement, Physicians' Hospital of Desert Cities, LLC shall have no further obligations under this Agreement. Advisor shall not assign or delegate this Agreement, or any portion of this Agreement, without the prior written consent of Company.

**Exclusivity:**

The Company agrees that no other corporate or financial advisor is or will be authorized by it during the Term of this Agreement to perform corporate or financial services on the Company's behalf of the type described hereunder or other services which Advisor and the Company

6

otherwise agree will be performed by Advisor hereunder without the prior written approval of
Advisor.    Notwithstanding the foregoing, Advisor acknowledges that the Company has
employed other advisors, including legal counsel and HDG. No fee payable to any other
financial, legal, or other advisor either by the Company or any other entity shall reduce or
otherwise affect the fees payable hereunder to Advisor, except as otherwise agreed to in writing
by Advisor. In order to coordinate our efforts with respect to a possible Transaction, during the
period of our engagement hereunder neither the Company nor any representative thereof (other
than Advisor) will engage in discussions, other than with HDG or Company's legal or accounting
advisors, regarding a Transaction except with or through Advisor.    If the Company or its
management receives an inquiry regarding a Transaction, it will promptly inform Advisor in
writing of such inquiry.

Confidentiality:

The Company agrees that, without Advisor's prior written consent, it will not disclose, and will
not include in any public announcement, the name or names of any investor, buyer, or strategic
partner, unless and until such disclosure is required by law or applicable regulation, and then
only to the extent of such requirement, unless the Company has received in writing approval
from such investor, buyer or strategic partner.

The Advisor hereby acknowledges that Company will provide it proprietary information
including, without limitation, strategic plans, financial data, know how, business plans,
advertising plans, proprietary software and other confidential material (collectively, the
**"Company Confidential Information"**). The Advisor hereby agrees that for a period of five (5)
years following Termination, it will not disclose any Company Confidential Information and
shall only use such Company Confidential Information in order to perform its services to the
Company as described in this Agreement. The Advisor agrees to cause all of its representatives
to abide by its confidentiality obligations hereunder and agrees to be liable to the Company for
any failure by any of its representatives to abide by such obligations. It is hereby agreed that
"Company Confidential Information" does not include information which (i) generally becomes
available to the public, or (ii) becomes available to the Advisor on a non-confidential basis from
a source other than the Company so long as such source is not reasonably known to the Advisor
to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation.

The Company hereby acknowledges that the Advisor will provide it proprietary
information including, without limitation, strategic plans, financial data, know how, business
plans, advertising plans, proprietary software and other confidential material (collectively, the
**"Advisor Confidential Information"**). The Company hereby agrees that for a period of five (5)
years following Termination, it will not disclose any Advisor Confidential Information and shall
only use such Advisor Confidential Information in connection with his Agreement.    The
Company agrees to cause all of its representatives to abide by its confidentiality obligations
hereunder and agrees to be liable to the Advisor for any failure by any of its representatives to
abide by such obligations. It is hereby agreed that "Advisor Confidential Information" does not
include information which (i) generally becomes available to the public, or (ii) becomes
available to the Company on a non-confidential basis from a source other than the Advisor so

7

May 25 11 06:28p    GA                                        76  0-8857                    p.8

long as such source is not reasonably known to the Company to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation.

Notwithstanding anything to the contrary in this Agreement, it is acknowledged and agreed that the knowledge and know how relating to the proposed Transaction is Advisor Confidential information. The Company further agrees that the Advisor may share information relating to this Transaction to market its services and such sharing of information shall not be deemed a breach of this Agreement.

Closing:

The closing ("Closing") of a Transaction shall be deemed to occur on the earlier of the date of execution of all material legal documentation or the transfer (if applicable) of funds. Any Closing is subject to documentation satisfactory to the Company and approval by the Company's Board of Directors.

Information Furnished by the Company:

The Company will furnish Advisor with all financial and other information and data as Advisor believes appropriate in connection with its activities on the Company's behalf, and shall provide Advisor full access to its officers, directors, and professional advisors and such employees as Company deems advisable. The Company agrees that it and its counsel will be solely responsible for ensuring that the Company's activities with respect to the Project and its present or future operations conducted by Company comply in all respects with applicable law. The Company represents and warrants that any written or oral communication with Advisor at all times through Closing will not contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading. The Company will promptly notify Advisor if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to Advisor. The Company recognizes and confirms that Advisor, in connection with performing its services hereunder, (i) will be relying without investigation upon all information that is available from public sources or supplied to it by or on behalf of the Company or its advisors, (ii) will not in any respect be responsible for the accuracy or completeness of, or have any obligation to verify, the same and (iii) will not conduct any appraisal of any assets of the Company. The Company will also cause to be furnished to Advisor at the Closing copies of such agreements, opinions, certificates and other documents delivered at the Closing as Advisor may reasonably request.

Waiver of Conflicts:

The Company acknowledges that Advisor and its affiliates have and will continue to have relationships with parties other than the Company, pursuant to which Advisor may acquire information of interest to the Company. Advisor shall have no obligation to disclose such information to the Company, or to use such information in connection with any contemplated Transaction. The Company recognizes that Advisor is being engaged hereunder to provide the

8

services described above only to the Company and to all other parties, if any, who execute this Agreement in specified other capacities and is not acting as an agent or a fiduciary of, and shall have no duties or liability to, the equity holders or members of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. No one other than the Company (and such other parties in such capacities, if any) is authorized to rely upon the engagement of Advisor hereunder or any statements, advice, opinions or conduct by Advisor. Upon termination of this Agreement (as defined in the "Termination of Agreement" section of this Agreement), the Company agrees to release Advisor with respect to the provision of future services to the Company or affiliates of the Company. Such services may include, but not be limited to, those described in this Agreement.

The Advisor acknowledges that Company and its affiliates have and will continue to have relationships with parties other than the Advisor, pursuant to which Company may acquire information of interest to the Advisor. Notwithstanding anything to the contrary herein, Company shall have no obligation to disclose such information to the Advisor, or to use such information in connection with any contemplated Transaction, provided however, that the Company shall disclose such information to Advisor if the information is relevant to Advisor's performance of its obligations under this Agreement.

### Termination of Agreement

This Agreement may not be terminated during the Term, except for "Cause" as defined herein. "Cause" shall exist, in the case of Company, if Company fails materially to comply with the terms hereof, including, but not limited to, a material failure to undertake the obligations imposed upon it hereunder or pursuant to other agreements in connection with the development of the Project, failure to cooperate with Advisor, or failure to pay to Advisor any sum required to be paid hereunder. In the case of Advisor, "Cause" shall exist if Advisor fails materially to comply with its obligations hereunder. In either case, the Agreement may not be terminated until (i) the party seeking to terminate the Agreement has given the other party not less than thirty (30) days' written notice specifying in reasonable detail the failure of such party giving rise to the asserted right to terminate; and (ii) the other party has been given a reasonable opportunity to cure such failure provided each party can show within ninety (90) days that it is taking all reasonable steps to cure any alleged breach and such breach shall be cured within a reasonable period of time. Upon the expiration of such period and cure opportunity, if the terminated party is the Company, then Advisor shall have no further obligation to perform services, but the Company shall be obligated to pay any and all amounts accrued to and through the date of termination. If the terminated party is the Advisor, then upon termination the Company shall have no further obligation to pay Advisor except with respect to amounts already due and payable under the Project Management Fee and Advisor shall have no further obligation to perform any further services. If the termination of Advisor for Cause occurs prior to the Closing of a Hospital-Related Sale, Advisor shall not be entitled to any portion of the Equity Equivalent Fee, but the Advisor shall be paid the Project Financing Fee in full. In the case of a termination hereunder, such party shall promptly return to the other party any and all property, drawings, and other materials that may have been provided to each other herein.

9

**Post-Termination Transactions:**

Notwithstanding anything to the contrary herein, if any Covered Party (or their respective affiliates) consummates a Transaction with the Company where Advisor is not the placement agent or financial advisor, at any time within twenty-four (24) months after the Termination for any reason or expiration of the Term, as extended, the Company agrees to promptly pay the Advisor those fees as described herein that are the responsibility of the Company. A Transaction shall be deemed consummated before such date if the Company shall have entered into any definitive written agreement which includes material terms of such Transaction prior to such date even if the closing of such agreement occurs later.

**Attorneys' Fees Provision:**

In the event of any legal dispute between the Company and the Advisor, all reasonable attorneys' fees and related expenses of the prevailing party shall be paid by the other party (which shall include recovery of costs by the prevailing party and an award of interest at 10% per annum calculated from 30 days after the date a written request for such expenses is delivered by the prevailing party to the other party hereto until the date of payment).

**Governing Law and Jurisdiction:**

This Agreement is governed by and construed in accordance with the laws of the state of California without regard to choice of laws provisions. All lawsuits, hearings, arbitration or other proceedings shall take place in Riverside County, State of California. The parties irrevocably waive any objections they may have based on improper venue or inconvenient forum in such forum.

**Miscellaneous:**

It is understood and agreed that Advisor will act under this Agreement as an independent contractor with obligations solely to the Company and is not being retained hereunder to advise the Company as to the underlying business decision to consummate any Transaction or with respect to any related financing, derivative or other transaction. Nothing in this Agreement or the nature of our services shall be deemed to create a fiduciary or agency relationship between Advisor and the Company or its stockholders, employees or creditors, in connection with the Transaction or otherwise. Other than as set forth in the indemnification provisions of this Agreement, nothing in this Agreement is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or related hereto. The Company agrees that Advisor shall not have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) in contract, tort or otherwise to the Company, or to any person claiming through the Company, in connection with the engagement of Advisor pursuant to this Agreement and the matters contemplated hereby, except where such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to

10

have resulted primarily and directly from the fraud, gross negligence, or willful misconduct of Advisor. The Company further agrees that Advisor shall have no responsibility for any act or omission by any of the Company's Representatives.

This engagement is with the Company only and no other party is intended as a third party beneficiary of the engagement letter.  Any communications with shareholders, members, directors, managers and/or partners of the Company are intended solely within their respective capacities as shareholders, directors/managers or officers of the Company and are not intended in their individual capacities.

### Indemnification:

Recognizing that Advisor, in providing the services contemplated hereby, will be acting as representative of and relying on information provided by the Company, the Company agrees to protect, defend, indemnify and hold Advisor harmless against claims, losses, expenses, damages and other costs incurred by Advisor in connection with the services provided herein, in the absence of intentional misconduct or gross negligence on the part of Advisor or any of its representatives. The Company shall use reasonable efforts to cause any binding agreements with acquirers or providers of capital or financing to include exculpation and indemnification provisions in favor of Advisor which are equivalent to the foregoing and are binding on such persons.  The Company shall be entitled, in its sole discretion, to defend any claim, dispute, lawsuit, investigation, arbitration, mediation or other proceeding that may trigger indemnification obligations hereunder (a "**Proceeding**").  In no event may the Advisor settle any Proceeding with a third party without the prior written consent of the Company.

### Severability:

The provisions of this Agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement, in accordance with the terms hereof.  If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written.

### Counterparts:

This letter may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this letter agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this letter agreement as to the parties and may be used in lieu of the original letter agreement for

all purposes. Signatures of the parties transmitted by electronic transmission, including by facsimile and e-mail, shall be deemed to be their original signatures for any purpose whatsoever.

If this Agreement meets with the Company's approval, please indicate the Company's acceptance of the above by signing where indicated below and returning this Agreement by facsimile and the original by mail to the undersigned.

Thank you for the opportunity to be of service.

Sincerely,

Lee J. Ploszaj
Manager
Winners Development Group's, LLC,
a Nevada limited liability company


AGREED AND ACCEPTED:

The foregoing accurately sets forth our understanding and agreement with respect to the matters set forth herein.

PHYSICIANS' HOSPITAL OF DESERT CITIES, LLC

By: _Chair_                          on unanimous
                                     agreement by
Name: _Gary Annunziats_              the board of
                                     managers
Title: _Chair_

Date: _5-25-11_

U:\ATTORNEYS\JCP\Winners Energy Group, LLC 5\NASHDOCS-#825241-v2-Winners_Engagement_Letter 051911.DOC

# EXHIBIT A

## Covered Parties

- National Standard Finance, LLC, and any affiliated or related parties.

- Royal Bank of Canada, and any affiliated or related parties.

- Balfour Beatty Construction, and any affiliated or related parties.

13

# EXHIBIT B

## PROJECT MASTER DEVELOPMENT SCHEDULE
### [TO COME]

C:\Documents and Settings\Administrator\My Documents\NASHDOCS-#825241-v7-Winners_Engagement_Letter.doc
N CWCI 825241 v7
2912746-000001 05/25/2011

May 25  11  06:32p     GA                                          -770-8857          p.15

## EXHIBIT C

### Fee Schedule

Pre-Development Financing and Permanent Loan "Debt" (in Millions)

| Amount up to | Fee |
|---|---|
| Percentage payable on amount raised up to $25.0 | 4.0% |
| Percentage payable on next amounts raised over $25.0 but not over $100.0 | 3.5% |
| Percentage payable on next amounts raised over $100.0 but not over $200.0 | 3.0% |
| Percentage payable on next amounts raised over $200.0 but not over $300.0 | 2.5% |
| Percentage payable on next amounts raised over $300.0 | 2.0% |

15

Exhibit B



101 California Street
Suite 150
San Francisco, CA 94111
Tel: (415) 946. 176
www.NatStandard.com

June 9th, 2011

Gary M. Annunziata D.O. FACP APC
Chairman
Physicians Hospital Desert Cities LLC
35900 Bob Hope Drive, # 275
Rancho Mirage, CA 92270

And

Fred Wagenhals
Chairman
Winners Development, LLC
6401 E Thomas Road, # 106
Scottsdale, AZ 85251-6078

Re:   Physicians Hospital of Desert Cities, Palm Desert, CA
      Forward Conditional Commitment # 09062011, Purchase & Investment Agreement

Dear Messer's Annunziata and Wagenhals,

National Standard Finance, LLC referred to as "NATIONAL STANDARD" has received and reviewed
your proposed hospital development project information and investment request. Based on the accuracy of
the information received from you, and our level of interest in your request, we are pleased to issue this
forward conditional commitment for asset purchase and construction investment ("Forward Conditional
Commitment") of the Physicians Hospital and Medical Office Building of Desert Cities ("Property")
located in Palm Desert, CA and leased to a creditworthy health system under a long term net lease
agreement ("Tenant") acceptable to NATIONAL STANDARD. This Forward Conditional Commitment
will summarize the general terms and conditions under which National Standard is prepared to invest the
development costs of the proposed Property in an amount not to exceed a gross investment of U. S.
$309,120,580.40 which includes hard and soft development costs as well as finance costs during the
twenty four month construction period. The terms of this Forward Conditional Commitment are subject to
full underwriting, formal due diligence and are subject to modification until approved by NATIONAL
STANDARD.

Accordingly, NATIONAL STANDARD's willingness to reach financial close on the proposed investment
described herein is subject to NATIONAL STANDARD's satisfaction, upon completion of our due
diligence, with all aspects of the proposed transaction, including but not limited to, (i) the business,
operations, properties, assets, liabilities (whether contractual or otherwise, and including without limitation
environmental liabilities), condition (financial or otherwise) and prospects of Tenant and Sponsor, (ii) the
legal and capital structure of Tenant and Sponsor, (iii) execution of an acceptable lease by Scripps Health,
(iv) completion of environmental review, appraisal, survey and title within sixty days of financial close, (v)

*National Standard Finance, LLC*

Jun. 14. 2011 11:55AM   DESERT GASTRO 760 321 5720   No. 0240   P. 2/8
Jun. 14. 2011  9:14AM   eSERT GASTRO 760 321 5720   No. 0216   P. 1/7



**NATIONAL STANDARD**

review and due diligence conducted by investors, attorneys, accountants and other professionals as deemed appropriate by NATIONAL STANDARD, (vi) the negotiation, completion and delivery of required investment and financing documentation as required by NATIONAL STANDARD and its counsel and (vii) the absence of any Material Adverse Change in the financial or credit condition of the Tenant or Sponsor.

In the event that our continuing review of Tenant and Sponsor discloses information relating to conditions or events not previously disclosed to us or relating to new information or additional developments concerning conditions or events previously disclosed to us which we believe may have a materially adverse effect on our investment in or financing of the Property, we may, in our sole discretion, terminate this Forward Conditional Commitment; suggest alternative investment terms or amend the Forward Conditional Commitment to reflect the nature of the information. No modification or waiver of the requirements set forth herein shall be effective unless signed by the Sponsor and NATIONAL STANDARD. NATIONAL STANDARD is conducting the role as a real estate buyer and investor in this proposed transaction and is not offering or proposing a loan or other debt financing.

The basic terms are as follows:

**Sponsor/Seller:**  Physicians Hospital of Desert Cities LLC

**Tenant:**  Tenant shall be a to be determined credit worthy health system with a credit rating of "not less" than Standard & Poor's "A" stable outlook and Moody's "A2" stable outlook and preferably at least Standard & Poor's "A" or Moody's "Aa2" or better at time of lease execution.  NATIONAL STANDARD shall have sole discretion in regards to approving any proposed health system as potential Tenant.

**Buyer/Investor:**  National Standard Finance, LLC through a to be formed California special purpose entity limited liability company

**Lease Type:**  Date Certain Rent Commencement Bond or NNN Lease, specimen included as addendum.

**Investment Amount / Purchase Price:**  U.S. $309,120,580.40 (Three Hundred Nine Million One Hundred Twenty Thousand Five Hundred Eighty U.S. Dollars and Forty Cents). Note: Should project costs change prior to rate lock and final commitment the Investment Amount and Purchase Price shall be amended to reflect the change in costs subject to approval by NATIONAL STANDARD. Any modification of the Investment Amount or lease term shall result in a change to amount of Base Rent Payment.

**Contract Date:**  Upon OSHPOD approval and Notice to Proceed with lease execution by Tenant estimated at eighteen (18) months from the date of this Forward Conditional Commitment.

p. 4                    7604871741                                        Russell Piccoli   Dec 15 12 10:24a

Jun. 14. 2011 11:55AM    USS    GASTRO 760 321 5720    No. 0216  P. 1/7
Jun. 14. 2011  8:14AM    SERI GASTRO 760 321 5720    No. 0216  P. 1/7

**NATIONAL STANDARD**

| | |
|---|---|
| Trustee: | Wells Fargo Bank, trustee will collect rent payments on behalf of NATIONAL STANDARD |
| Legal: | Mayer Brown, Chicago, IL |
| Lease Term: | Three hundred (300) months, 25 years |
| Construction Period: | Twenty four (24) Months |
| Developer: | Winners Development, LLC |
| Contractor: | Balfour Beatty Construction |
| Use of Proceeds: | Construction of a hospital and medical office building complex in Palm Desert, California |
| Base Rent Payment: | U.S. $2,165,578.08 per month or U.S. $25,986,937.00 per year.<br><br>Rental payments and lease terms are subject to modification determined by selection of Tenant by Sponsor/Seller based upon the financial health, industry reputation and credit quality of the to be determined Tenant and associated financial risk factors related to the Tenant's ability to meet the lease obligations. |
| Rent Escalation: | 2.40% per annum of prior year's rent |
| Purchase/Investment Closing Requirements: | Sponsor/Seller agrees to obtain and submit to NATIONAL STANDARD, its assigns, affiliates, or successors all documents and items required by its legal counsel and underwriting department in connection with the processing, due diligence, approval process and closing of this lease. In addition, Tenant and Sponsor agrees to execute, or cause to be executed by all other required parties, all lease documents and other legal instruments required in a form and substance to insure Tenant's liability and unconditional obligation for the full repayment of this lease. NATIONAL STANDARD reserves the right to participate this transaction with other lenders or investors. |
| Transaction Costs; Transaction Expenses: | Sponsor/Seller shall be responsible for all out of pocket expenses as defined below as well as all third party transaction expenses related to completion of requirements necessary to close transaction including, but not limited to: appraisal, environmental phase 1 report, legal, travel expenses to amend meetings and third party out of pocket expenses required by National Standard. A lease security deposit of one (1.00%) percent shall be paid by Sponsor to National Standard or its assign at time of execution of commitment and rate lock of lease. The lease security deposit is refundable at closing or if National Standard elects to not complete the transaction due to no fault of Sponsor. |

3

p.5    7604871741    Russell Piccoli    Dec 15 12 10:25a

Jan. 14. 2011  8:14AM    ESEAT GASTRO 769 321 5720                No. 0216  P. 1/7



NATIONAL STANDARD

| | |
|---|---|
| Standby Forward Purchase/Investment Fee; | Twenty Five (25) basis points (One Fourth of One Percent) of the stated Investment Amount and Purchase Price shall be due to NATIONAL STANDARD upon acceptance of this Forward Conditional Commitment. Of the forward conditional commitment fee, $75,000.00 shall be due, payable, and deemed earned upon execution of this Forward Conditional Commitment letter. The remaining amount owed of the fee shall be due and payable immediately upon completion of the pre-development budget funding by Royal Bank of Canada. |
| Tenant Documents: | a) Sponsor shall provide the following to National Standard at the earliest opportunity following OSHPOD approval and notification of notice to proceed: |
| | b) A copy of all plans, specifications, all permits and entitlements for the Property; |
| | c) Legal opinion from local counsel in form and substance acceptable to NATIONAL STANDARD and its counsel; |
| | d) Copies of all available environmental and physical condition reports and notices (including all Phase I, Phase II, ADA and soil reports for the Property, as available); Must be dated within 60 days prior to closing. |
| | e) All appraisal or valuations related to the Property; Must be dated within 60 days prior to closing. |
| | f) All guaranties and warranties in effect with respect to all or any portion of the Property; |
| | g) Financial Statements on the corporation, Tenant and if applicable including Personal Financial Statements on all owners owning greater than 10% equity in the company/project. |
| | h) Copies of the most recent survey and title report and the existing owner's title insurance policy; |
| | i) Copies of all existing loan or mortgage documents on property that must be paid from proceeds to result in clear title; and |
| | j) A statement of insurance coverage and premiums by policy type and copies of all insurance policies; |
| | k) A description of all pending or existing litigation involving the Property, Sponsor and Tenant. |
| Other Conditions: | 1) There being, in NATIONAL STANDARD's sole opinion, no material change or prospect thereof in Tenant's structure, ownership, financial condition (including credit rating), or project feasibility between the date of the most recent Standard and Poor's and Moody's credit report obtained by NATIONAL STANDARD and the date of the closing. |

p.6        760487174I                              Russell Piccoli        Dec 15 12 10:25a

JUN. 14. 2011 11:50AM   DESERT GASTRO 760 321 5720   No. 0246   P. 370

Jun. 14. 2011 8:15AM   SERT GASTRO 760 321 5720   No. 0216   P. 7



2) Negotiation of final and definitive closing documentation in for and substance in all respects satisfactory to all parties to the transaction and their respective legal counsel including an executed acceptable lease with Tenant and a Purchase and Sale Agreement with Sponsor.

3) Capital costs assumptions and lease pricing contained herein is based upon National Standard's current money cost assumptions based upon current rates and financial/real estate market conditions. Should these assumptions change or the Sponsor/Seller select a health system as proposed tenant with a credit rating of less than Standard & Poor's "AA" or Moody's "Aa2", National Standard reserves the right to modify the lease pricing and terms until rate lock of lease terms and final commitment up to ninety days prior to financial close subject to lease finalization timing.

4) Customary real estate, legal and financial due diligence and underwriting for this type of transaction.

5) An acceptable lease per attached specimen by an acceptable health system as Tenant in NATIONAL STANDARD'S sole discretion in regards to the proposed Tenant's financial condition.

6) Approval by NATIONAL STANDARD of any and all changes in the Tenant or lease agreement, terms and conditions prior to closing.

**Legal Jurisdiction:**   This letter and proposal shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York, U.S.A. without regard to principles of conflicts of laws. Applicant submits to the exclusive jurisdiction of the courts of the New York, N.Y., U.S.A. for the resolution of any dispute in connection with Proposal. Both parties waive any right to a jury trial. Sponsor/Seller acknowledges that NATIONAL STANDARD will be relying on information supplied by Sponsor/Seller in evaluating this Forward Conditional Commitment. Sponsor/Seller agrees to update any information provided by Tenant/Sponsor and to disclose all material information (financial, legal or otherwise) concerning the Tenant or Sponsor or any of its principals, or the proposed project, which may affect the investor's decision to proceed with this application. Tenant/Sponsor and the Tenant/Sponsor principal(s) each hereby represent, warrant, covenant and agree that: (i) they have the power and authority to execute this Proposal, to bind Sponsor/Seller and the Sponsor/Seller principal(s) hereunder, (ii) the proposed transaction described herein is not the subject of a commitment or term sheet from another equity, lender or investor; (iii) no other party has a right of refusal or other option which could cause the lease not to be consummated.

p. 7   7604871741   Dec 15 12 10:25a   Russell Picooli



**National Standard**

**Full Agreement**

This agreement contains the full and complete understanding of the parties. Any prior writings or verbal agreements of the parties shall be superseded by this writing. Any changes to this agreement must be in writing, signed by all parties, and dated subsequent to this writing.

**Patriot Act:**

NATIONAL STANDARD is committed to complying with U.S. statutory and regulatory requirements designed to assist the federal government in combating money laundering and any activity which facilitates the funding of terrorist or criminal activities. The USA PATRIOT Act enhances the money laundering prevention requirements imposed on securities firms and other financial institutions. As part of our customer identification and verification procedures, NATIONAL STANDARD may ask Tenant/Sponsor and Tenant/Sponsor principals to provide additional information as necessary to verify their identity and comply with these procedures. Until such additional information or documentation is provided, NATIONAL STANDARD may not be able to effect any transactions for the Tenant/Sponsor or Tenant/Sponsor principals.

**Material Adverse Change:**

The obligation of NATIONAL STANDARD to close, purchase and fund the transaction is subject to (i) there not occurring or becoming known to NATIONAL STANDARD any material adverse condition or material adverse change in or affecting the business, operations, property, condition (financial or otherwise) or prospects of the Tenant or Sponsor, (ii) NATIONAL STANDARD not becoming aware after the date hereof of any information or other matter affecting the Tenant/Sponsor or any Tenant/Sponsor principal which is inconsistent in a material and adverse manner with any such information or other matter disclosed to NATIONAL STANDARD prior to the date hereof.

**Jury Waiver:**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NATIONAL STANDARD AND TENANT/SPONSOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF THE PROPOSED LEASE, ANY AGREEMENT TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THE PROVISIONS OF THIS SECTION ARE MATERIAL INDUCEMENTS FOR NATIONAL STANDARD CONSIDERING THE PROPOSED PURCHASE INVESTMENT AND LEASE.

**Expiration:**

This Forward Conditional Commitment shall expire and be of no further force or effect unless Physicians Hospital of Desert Cities LLC signifies its concurrence of such by delivering a completed and fully executed copy or original along with the forward conditional commitment fee described above to National Standard no later than close of business on June 7th, 2011.

Jun. 14. 2011 11:57AM    DESERT GASTRO 760 321 5720                    No. 0246    P. 1/8
Jun. 14. 2011  3:15AM    DESERT GASTRO 760 321 5720                    No. 0216    P. 1/7

**NATIONAL STANDARD**

We at National Standard Finance, LLC appreciate this opportunity to do business with your company, and look forward to working with you on this transaction.

Sincerely,                                    Accepted and Agreed to:
National Standard Finance, LLC                Physicians Hospital of Desert Cities LLC


By: _____                  By: _____
    Mr. S. Petrenko, Principal                    Dr. Gary M. Annunziata, Chairman


Signature page of Forward Conditional Commitment for Purchase and Investment Agreement
Physicians Hospital of Desert Cities LLC
Forward Conditional Commitment # 09062011
June 9th, 2011
$309,120,580.40 Gross Investment/Purchase Price
25-Year Date Certain Bond Lease

Jun. 14. 2011 11:57AM   DE'  'T GASTRO 760 321 5770          No. 0246   P. 8/8



101 Cali ' rnia Street
Suite 2450
San Francis  , CA 94111
4 15.946.8976
www.NatS ' ndard.com

## MEMORANDUM OF UNDERSTANDING
### June 9th, 2011
### Between Physicians Hospital of Desert Cities LLC and National Standard Finance, LLC

Whereas:

1. Physicians Hospital of Desert Cities LLC has approached National Standard Finance, LLC ("NSF") to request an investment and purchase for its proposed real estate development of a hospital and medical office building transaction in Palm Desert, CA, and

2. NSF has reviewed this request and responded with an investment and purchase proposal (the "Forward Conditional Commitment") dated June 9, 2011, NSF Forward Conditional Commit  nt Number 09062011, and

3. Said Forward Conditional Commitment was prepared by NSF with the assumption given b  Physicians Hospital of Desert Cities LLC that the lease holder and ultimate tenant of the project woul  be Scripps Health subject to successful lease and project negotiations, and

4. Said Forward Conditional Commitment was prepared by NSF dependent upon the credit rat  g, financial history and reputation of Scripps Health as to the project's viability, the investment rate  and terms, investment amounts, and other particulars of the Forward Conditional Commitment, and,

5. Physicians Hospital of Desert Cities LLC having requested that NSF prepare an alternate v  sion of the Forward Conditional Commitment removing the specific name of Scripps Health as tenant  d inserting in its place a generic reference to a to be determined tenant, and

6. Physicians Hospital of Desert Cities LLC having requested the aforementioned change solel  for its own strategic purposes and future health system negotiations, and

7. Notwithstanding that the Forward Conditional Commitment already allows for changes in  investment amount or lease terms dependent on changes to the tenant and credit quality of the any alterna  . Tenant up until time of final commitment and lease execution,

IT IS HEREBY understood, accepted and agreed that the NSF Forward Conditional Commitment  subject to change or withdrawal in the event that Scripps Health is not the tenant and guarantor of the lease refer  aced in the Forward Conditional Commitment; that is, removal of the name of Scripps Health does not negate the  act that the Forward Conditional Commitment was prepared with Scripps Health as the tenant and that any ch  nge to this underlying assumption may render the Forward Conditional Commitment void and subject to r  evaluation, underwriting and approval of any alternate proposed tenant other than Scripps Health at NSF's sole di  retion.

If you are in complete agreement with the contents and documented understanding expressed in this Memorandum of Understanding, please signify your agreement and acceptance by executing and datin  accordingly below.

Understood, accepted and agreed by

Physicians Hospital of Desert Cities LLC                    National Standard Finance, LLC

_____                                _____

Dr. Gary M. Annunziata, Chairman                    Jan S. Petronko, Principal

*National Standard Finance, LLC*

1

**PROOF OF SERVICE**
**(Declaration)**

2

**(C.C.P. §§1013(a) and 2015.5)**

3    STATE OF CALIFORNIA    )
                             )  ss.
4    COUNTY OF RIVERSIDE    )

5

        I, the undersigned, declare:

6

        I am employed in the County of Riverside, State of California. I am over the age of 18 and not
7    a party to the within action. My business address is 3750 University Avenue, Suite 610, Riverside,
     California 92501.

8

        On July 31, 2013, I served the following **FIRST AMENDED COMPLAINT** on the interested
9    party(ies) in this action by placing a true and correct copy of each document thereof, enclosed in a sealed
     envelope, addressed as follows:

10

     M.D. Scully, Esq.
11   Allison F. Borts, Esq.
     Justin D. Lewis, Esq.
12   GORDON & REES, LLP
     101 W. Broadway, Suite 2000
13   San Diego, CA 92101

14   ( ) **By Mail:** I am readily familiar with Varner & Brandt, LLP's business practice for collection and
     processing of correspondence for mailing with the United States Postal Service. I know that the
15   correspondence is deposited with the United States Postal Service on the same day this declaration was
     executed in the ordinary course of business. I know that the envelope was sealed and, with postage
16   thereon fully prepaid, placed for collection and mailing on this date, following ordinary business
     practices, in the United States mail at Riverside, California.

17

     ( ) **By Personal Service:** I delivered such document(s) by hand to the above address(es).

18

     (X) **By Overnight Courier:** I caused the above-referenced document(s) to be delivered to an overnight
19   courier service (Federal Express) for delivery to the above address(es).

20   ( ) **By Facsimile Machine:** I caused the above-referenced document(s) to be transmitted to the above-
     named persons at the following telephone number(s) _____. Attached to this declaration
21   is a "FAX Confirmation Report" confirming the status of transmission.

22   ( ) **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing
     is true and correct.

23

     (X) **(Federal)** I declare that I am employed in the office of a member of the bar of this court at whose
24   direction this service was made.

25

26                                                    _Olivia Banke_____
                                                      OLIVIA BANKE
27

28

