1   Mark L. Karasik  (admitted *pro hac vice*)
  Jonathan H. Ebner (*pro hac vice* application filed and pending)
2   **Baker & McKenzie LLP** .
  300 East Randolph Street, Suite 5000
3   Chicago, Illinois 60601
  Telephone: +1 312 861 8000
4   Facsimile:  +1 312 861 2899
  mark.karasik@bakermckenzie.com
5   jon.ebner@bakermckenzie.com
  Attorneys for defendants and counterclaimants
6   PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., DESERT CITIES HEALTH
  DEVELOPMENT GROUP, LLC, AND DESERT CITIES HEALTH MANAGEMENT
7   GROUP, LLC

<table>
<tr><td></td><td></td></tr>
</table>

FILED
CLERK, U.S. DISTRICT COURT

1/10/14

CENTRAL DISTRICT OF CALIFORNIA
BY: _____mm_____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL STANDARD FINANCE, L.L.C., *et al.*, <br><br>             Plaintiffs, <br><br>     vs. <br><br> PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., *et al.* <br><br>            Defendants; <br><br><br> PHYSICIANS HOSPITAL OF DESERT CITIES, LLC, DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, DESERT CITIES HEALTH MANAGEMENT GROUP, LLC, <br><br>            Counterclaimants, <br><br>     vs. <br><br> WINNERS DEVELOPMENT GROUP 5, L.L.C., Fred Wagenhals, Lee Ploszaj, and DOES 1-20, inclusive, <br><br>            Counter-defendants and Third-Party Defendants. | Case no. 5:13-cv-10 <br> Hon. David T. Bristow <br><br> COUNTER-COMPLAINT AND THIRD-PARTY ACTION OF PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT CITIES HEALTH MANAGEMENT GROUP, LLC <br><br><br> DEMAND FOR JURY TRIAL |

    Defendants and counterclaimants Physicians Hospital of Desert Cities, L.L.C. ("PHDC"),

Desert Cities Health Development Group, LLC ("Development LLC"), Desert Cities Health

Management Group, LLC ("Management LLC") (collectively, the "Counterclaimants"),

-1-

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF
DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT
CITIES HEALTH MANAGEMENT GROUP, LLC

complains of counter-defendant Winners Development Group 5, L.L.C. ("Winners"), Fred Wagenhals ("Wagenhals"), Lee Ploszaj ("Ploszaj") ("Third-Party Defendants") (collectively, "Counter-Defendants"), as follows:

## INTRODUCTION

Hubristically calling themselves "Winners," the Counter-Defendants sold the Counterclaimants a bill of goods. From the beginning of the parties' relationship, the Counter-Defendants made representations and promises that simply were not true. Most significantly they initially approached the Counterclaimants and presented themselves as experienced and capable in the development of a major hospital project. In fact, contrary to their representations, Counter-Defendants had no experience whatsoever developing a hospital. The lies didn't stop there. Winners' primary purpose for partnering with the Counterclaimants was their supposed ability to secure financing for a $300 million project. In fact, it became clear only after the agreements were signed that the Counter-Defendants needed and expected the Counterclaimants themselves to provide significant financing. After putting up more than $275,000, and realizing that the Counter-Defendants did not intend to make good on their promises, the Counterclaimants sought to end the relationship. The upshot is that based on the Counter-Defendants actions, the Counterclaimants are not only out of pocket a whole lot of money, but their dream to build a hospital is now dead. The Counter-Defendants, adding insult to injury, had the audacity to file the instant suit in which they seek even more money from the Counterclaimants. The Counterclaimants hereby seek all damages flowing from the Counter-Defendants many breaches and misrepresentations.

## PARTIES

1.      PHDC is a California limited liability company having its principal place of business in California.

2.      Development LLC is a California limited liability company having its principal place of business in California.

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT CITIES HEALTH MANAGEMENT GROUP, LLC

3.     Management LLC is a California limited liability company having its principal place of business in California.

4.     Winners is a Nevada limited liability company having its principal place of business in Arizona.

5.     Wagenhals is an individual who resides in Arizona.

6.     Ploszaj is an individual who resides in Arizona.

7.     Counterclaimants are ignorant of the true names and capacities of the persons or entities sued herein as Roes 1-20, inclusive, and therefore sues these persons or entities by such fictitious names. Counterclaimants will amend their counterclaims to allege their true names and capacities when ascertained. In the meantime, counterclaimants are informed and believe that each of the fictitiously named persons or entities is legally responsible in some manner for the occurrences herein alleged, and is subject to and liable for the relief prayed for below.

## FACTS COMMON TO ALL COUNTS

8.     The Counterclaimants sought to develop a new hospital (the "Project") in Palm Desert, California, to serve the Coachella Valley.

9.     In May 2011, PHDC and Winners entered into the contract attached hereto as exhibit A (hereinafter, the "Agreement").

10.     Under the Agreement, Winners promised to provide advisory services and to perform certain obligations in connection with the Project's planning, financing, and construction, among other aspects of the development.

11.     Among these obligations, Winners promised to obtain the Project's preliminary and permanent funding, to develop and revise appropriate Project planning documents, and to act at all times solely at the direction of PHDC.

12.     Even though Winners touted its supposedly extensive experience building major commercial properties across the United States, Winners utterly failed to discharge its obligations under the Agreement.

13.     Preliminary funding was necessary to propel the Project through its initial stages.

-3-

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT CITIES HEALTH MANAGEMENT GROUP, LLC

Accordingly, under the Agreement, Winners promised to "assist [PHDC] in securing financing for all Pre-Development services for the Project which include all services required to receive issuance of the OSHPD permit and a Permanent Loan." Winners further promised that it would "facilitate securing the Pre-Development Financing."

14.     Despite these promises, Winners never secured or facilitated the Project's preliminary funding.

15.     Although Winners negotiated with Royal Bank of Canada ("RBC Bank") regarding a potential line of credit for $25 million in preliminary funding, RBC Bank and Winners insisted that PHDC recruit individual investors in the Project to pledge personal guarantees as collateral.

16.     Nowhere does the Agreement in any way condition Winners' obligation to facilitate and secure preliminary funding upon PHDC's recruitment of individual investors to furnish personal guarantees of collateral.

17.     At one point, Winners committed to provide preliminary funding itself, via its principal Wagenhals, but Winners and Wagenhals then reneged on the commitment to do so.

18.     In the end, despite its contractual obligations, Winners admitted to PHDC that Winners could not source a lender to provide preliminary funding. Consistent with its admission, Winners never facilitated or secured preliminary funding through any source, leaving PHDC unable to complete even the initial stages of the Project's development.

19.     The Agreement provided that Winners would undertake all activities with respect to the Project solely "at the direction" of PHDC. Despite this obligation, Winners personnel approached representatives of Balfour Beatty Construction in Dallas, Texas, demanding some $3 million to sponsor Winners' participation in NASCAR automobile racing. In exchange, Winners promised the Balfour Beatty representatives that their firm would be hired to oversee or perform the Project's construction work.

-4-

20.     Winners presented this "deal" to Balfour Beatty without having been directed to do so by PHDC; indeed, Winners did so without PHDC's knowledge or consent. Balfour Beatty lost interest in the Project as a result of Winners' proposed NASCAR "deal."

21.     The Agreement also required Winners to prepare or revise certain Project planning documents, including a comprehensive "Project Master Development Schedule" and the "Singe Line Planning Documents."

22.     However, Winners did not prepare or revise appropriate planning documents in a timely or professional manner. In fact, Winners purposely inflated the Project's projected costs by tens of millions of dollars as a means to increase the fees Winners anticipated it would earn at various stages of the Project's development.

23.     The Project ultimately foundered. It was sunk by Winners' failure to honor its promise to facilitate and secure preliminary funding and its other breaches of the Agreement.

## COUNT I
## FRAUDULENT MISREPRESENTATION AND DEMAND FOR PUNITIVE DAMAGES
### (Against All Counter-Defendants)

24.     The Counterclaimants incorporate and re-allege all preceding paragraphs of this pleading as if set forth fully here.

25.     Winner's, through its agents, and Wagenhals and Ploszaj individually, orally and/or in writing, made the following misstatements or omissions of fact:

      a.  Counter-Defendants presented themselves as viable partners with experience in hospital development when in they had absolutely no experience developing hospitals. At the initial meetings between the parties over the weekend of March 26-27, attended by Wagenhals, Ploszaj, Gary Annunziata ("Annunziata"), Puneet Khanna ("Khanna"), Carlos Lopez ("Lopez"), and Doug Jodoin ("Jodoin"), both Wagenhals and Ploszaj represented that they were "experienced at building hospitals" and that they were qualified to

undertake this Project. The Counter-Defendants repeated this representation

on several occasions in 2011, including, but not limited to:

    a.   5/20/11 (dinner in Scottsdale, Arizona, Ploszaj repeated same

          representation to Annunziata and witness Joseph Caffery),

    b.   9/17/11 (dinner in Aspen, Colorado, Wagonhals and Plosjaz repeated

          same representation to Annunziata), and

    c.   11/5/11 (dinner at Bob Chinn's Restaurant in Wheeling, Illinois,

          Ploszaj repeated same representation to Annunziata and his attorney

          brother Craig Annunziata);

b.   Counter-Defendants represented on multiple occasions that they would fund

$25 million once UCSD signed a letter of intent, including statements made

on 8/19/11 (Wagenhals promise to Annunziata and Jodoin in Pason, Arizona

that he would personally fund the $25 million); *see also* Exhibit B, 11/10/11

email from Ploszaj ("[Wagenhals] said he hired Omalley in NY full time to

get this $25 [million] placed. He and Justin have been all over this!");

c.   After UCSD signed a letter of intent on or about October 21, 2011, the

Counter-Defendants claimed to have established a letter of credit with RBC

Bank. No such letter of credit was established. The Counter-Defendants

demanded that the Counterclaimants had to post collateral in the form of cash

or stocks to establish the letter of credit.

d.   Later, Wagenhals acknowledged and re-affirmed his contractual commitment,

and continued to promise that he would raise the $25 million in funding: "We

intend to abide by the terms of our contract and continue to assist in seeking

Pre-Development Financing ... we have taken a different approach to

structuring the $25M capital raise, and hope to generate better interest in the

project." Exhibit C, 1/13/12 email from Wagenhals to Annunziata.

26.     On information and belief, the Counter-Defendants' representations and omissions listed above were false.

27.     The Counter-Defendants knew that their representations and omissions listed above were false.

28.     The Counter-Defendants representations were made with the intention that they be relied on and acted on by the Counterclaimants. The Counter-Defendants intended for the Counterclaimants to execute the Agreement and continue to provide the Counter-Defendants with funding.

29.     The Counterclaimants reasonably relied on the Counter-Defendants' representations and omissions listed above, and accordingly, executed the Agreement and continued to provide financing for the Project for many months.

30.     The Counterclaimants have suffered damages, including consequential damages, in an amount to be proven at trial, by the Counter-Defendants' representations and omissions because they would not have signed the Agreement and continued to provide financing for the Project if they knew that the representations were false.

31.     Furthermore, the Counter-Defendants' conduct was "willful and wanton," with actual or deliberate intent to harm the Counterclaimants, or, shows an utter indifference to or conscious disregard for the Counterclaimants, such that justice and the public good require additional damages to punish the Counter-Defendants and to deter the Counter-Defendants and others from similar conduct.

32.     With respect to Winners' conduct. Winners, through its management, authorized the misrepresentations, which were made by its employees who were acting in the scope of their employment, or, in the alternative, the corporation, through its management or a managerial employee, ratified or approved the misrepresentations, such that justice and the public good require additional damages to punish the Counter-Defendants and to deter the Counter-Defendants and others from similar conduct.

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF
DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT
CITIES HEALTH MANAGEMENT GROUP, LLC

## COUNT II
## BREACH OF CONTRACT
### (Against Winners)

33.     The Counterclaimants incorporate and re-allege all preceding paragraphs of this pleading as if set forth fully here.

34.     PHDC and Winners entered into the Agreement, pursuant to which Winners promised to perform certain obligations with respect to the Project's development.  Most notably, these included the obligation to secure the Project's preliminary and permanent funding, to develop and revise appropriate Project planning documents, and to act at all times solely at the direction of PHDC.

35.     PHDC performed all, or substantially all, of its obligations under the Agreement.

36.     Winners breached the Agreement in the following ways, without limitation:

a.     By failing to "assist [PHDC] in securing financing for all Pre-Development services for the Project which include all services required to receive issuance of the OSHPD permit and a Permanent Loan," as required by article II of the Agreement;

b.     By failing to "facilitate securing the Pre-Development Financing," as required by Article II of the Agreement;

c.     By failing to act solely at the direction of PHDC, as required by article II of the Agreement, which provides that Winners "shall act in close coordination with and at the direction of [PHDC]";

d.     By failing to develop an appropriate and timely "Project Master Development Schedule," as required by article II of the Agreement, which provides in relevant part that Winners will "prepare and maintain a list of steps to be taken for land acquisition, finance planning, entitlement objectives, overall site development strategy, lease or sale negotiations of the underlying lands and the physical improvements of the Hospital, capital structuring for the Project, together with a…schedule for the

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT CITIES HEALTH MANAGEMENT GROUP, LLC

1        completion thereof, …within thirty (30) days of the execution of this

2        Agreement"; and

3        e.     By failing to appropriately revise "and refine the Single-Line Planning

4        Documents" "upon final review of the operating procedures, staffing

5        assumptions, and facility plan," as required by article II of the Agreement.

6        f.     By failing to provide consent to PHDC's assignment of its interests under

7        the Agreement, "which consent shall not be unreasonable withheld."

8        Exhibit A at 6.

9      37.    As a result of Winners' breaches of the Agreement, the Counterclaimants have

10  suffered damages in an amount to be proven at trial.

11

12            **COUNT III**

13     **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
                 **(Against Winners)**

14      38.    The Counterclaimants incorporate and re-allege all preceding paragraphs of this

15  pleading as if set forth fully here.

16      39.    PHDC and Winners entered into the Agreement, pursuant to which Winners

17  promised to perform certain obligations with respect to the Project's development.  Most

18  notably, these included the obligation to secure the Project's preliminary and permanent funding,

19  to develop and revise appropriate Project planning documents, and to act at all times solely at the

20  direction of PHDC.

21      40.    The Agreement included an implied promise by Winners to deal fairly with

22  PHDC and to work in good faith toward the Agreement's objectives, so as not to frustrate

23  PHDC's right to receive the benefits contemplated by the Agreement.

24      41.    PHDC performed all, or substantially all, of its obligations under the Agreement.

25      42.    Winners unfairly interfered with PHDC's right to receive the benefits of the

26  Agreement in the following ways, without limitation:

27

28                 -9-

a. By failing to "assist [PHDC] in securing financing for all Pre-Development services for the Project which include all services required to receive issuance of the OSHPD permit and a Permanent Loan," as required by article II of the Agreement;

b. By failing to "facilitate securing the Pre-Development Financing," as required by Article II of the Agreement;

c. By failing to act solely at the direction of PHDC, as required by article II of the Agreement, which provides that Winners "shall act in close coordination with and at the direction of [PHDC]";

d. By failing to develop an appropriate and timely "Project Master Development Schedule," as required by article II of the Agreement, which provides in relevant part that Winners will "prepare and maintain a list of steps to be taken for land acquisition, finance planning, entitlement objectives, overall site development strategy, lease or sale negotiations of the underlying lands and the physical improvements of the Hospital, capital structuring for the Project, together with a...schedule for the completion thereof, ...within thirty (30) days of the execution of this Agreement"; and

e. By failing to appropriately revise "and refine the Single-Line Planning Documents" "upon final review of the operating procedures, staffing assumptions, and facility plan," as required by article II of the Agreement.

43. As a result of Winners' breaches of the Agreement's implied covenant of good faith and fair dealing, PHDC has suffered damages in an amount to be proven at trial.

### PRAYER

WHEREFORE, the Counterclaimants pray for an award as follows:

1. For general and special damages according to proof, including prejudgment interest as allowed by law;

-10-

1           2.       For attorneys' fees as permitted by the Agreement;

2           3.       For punitive damages in an appropriate amount to punish Counter-Defendants and

3  deter Counter-Defendants and others from similar conduct;

4           4.       For costs of suit; and

5           5.       For such other and further relief as the Court deems just and proper.

6

7  Dated:   December ___, 2013                BAKER & McKENZIE LLP

8

9                                         By: _____

10                                       Attorneys for Counterclaimants and Third-

11                                     Party Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZRCP/107.167/11916174v.1

COUNTER-COMPLAINT AND THIRD-PARTY COMPLAINT OF PHYSICIANS HOSPITAL OF
DESERT CITIES, L.L.C., DESERT CITIES HEALTH DEVELOPMENT GROUP, LLC, AND DESERT
CITIES HEALTH MANAGEMENT GROUP, LLC

EXHIBIT A

May 20, 2011


Gary Annunziata, D.O.
Chair of the Board of Managers
Physicians' Hospital of Desert Cities, LLC
35900 Bob Hope Drive #275
Rancho Mirage, CA 92270

Dear Gary:

This letter shall confirm the engagement of Winners Development Group 5, LLC, a Nevada limited liability company ("Advisor") as the exclusive corporate and financial advisor and non-exclusive real estate development program manager to perform certain advisory services and the real estate development services that Physicians' Hospital of Desert Cities, LLC or its assignee ("PHDC" or the "Company," which terms shall include all affiliates and subsidiaries) requires in connection with the successful development and construction of a new hospital campus (including a general acute care hospital (the "Hospital") to be located on approximately 64 acres at the intersection of Varner Road and Cook Street in Thousand Palms, California (the "Property"). Acquisition, development, and construction of the Hospital and the real property associated with the Hospital shall be referred to herein as the "Project." We understand that PHDC presently has the Property under contract; we understand further that due to regulatory restrictions on PHDC's ownership and operation of a hospital, the Company intends to sell the Hospital (a "Hospital-Related Sale") once (i) entitlement is completed as confirmed through the issuance of a California Office of Statewide Health Planning & Development ("OSHPD") permit, and (ii) execution of a credit lease instrument with a mutually acceptable credit tenant (the "Tenant") (of which will be required) to consummate the sale to a hospital investor. The Company may also elect to separately develop a Medical Office Building ("MOB") on the Property and that portion of the Property that is not used in the construction of the Hospital. Development of the MOB and development of that portion of the Property not used in the construction of the Hospital shall not be included in the Project as outlined in this Agreement. However, if Company chooses to use one financing arranged by Advisor and project management services for development of an MOB, Advisor shall be entitled to a financing fee and project management fee to be agreed upon separately by the parties but consistent with terms and fees set forth in this Agreement..


The term of this Agreement shall run from the date of receipt by Advisor of the Company's signed acceptance of this Agreement until completion of the Project currently projected to be a minimum of 36 months thereafter, and will then automatically extend on a month-to-month basis if necessary until cancelled by either party pursuant to the terms hereof ("Term").

1

I.  Corporate Advisory Services:

The corporate advisory services that may be performed by the Advisor relate to the following types of Transactions with one or more entities introduced or identified by or on behalf of Advisor or Company, or who is in contact with or is contacted by Advisor or Company during the Term of the Agreement (individually or collectively, a "**Covered Party**"). For avoidance of doubt, all of the parties set forth on **Exhibit A**, which by this reference is incorporated herein, shall be deemed a Covered Party. Exhibit A may be amended from time to time by Advisor to include other parties that shall be deemed a Covered Party. Both the Company and the Advisor must agree on which of the following activities to pursue. As used in this Agreement, the term "**Transaction**" shall include, but specifically not be limited to or by:

a) a loan from a lender to the company to be used to finance the initial development of the Property ("**Pre-Development Financing**");

b) a loan from National Standard Finance or an affiliated party ("**NSF**") to a suitable investor and/or operator of the Hospital or other purchaser to be used to develop or purchase the Hospital ("**Permanent Loan**");

c) a purchase or pre-purchase by NSF, or by another purchaser of the Hospital;

d) a private placement, conducted pursuant to Regulation D of the Securities Act of 1933 or other applicable U.S. or foreign securities laws, rules and regulations with a Covered Party (a "**Private Placement**") including, without limitation, a placement of Company equity, debt, convertible securities or other financial instrument in such amount as the Company and the Advisor may agree upon. For purposes of this Agreement, "Placement Amount" shall mean, exclusive of warrants or other equity issued to Advisor, the amount raised in a Private Placement. Our services regarding a Private Placement do not constitute a firm underwriting or guaranty of raising any specific amount of capital, and we will not be required to engage in activities that would constitute acting as a broker or dealer as such terms are defined in any applicable state or federal securities laws;

e) a strategic alliance (a "**Strategic Alliance**") that involves an agreement with a Covered Party that may, either directly or indirectly, enter into any type of ownership, operating, sales, marketing and/or management agreement with the Company;

f) the sale of the Company (a "**Sale**" or "**Merger**"), whether by (i) merger, (ii) reverse merger, (iii) stock sale, or (iv) sale in one or more transactions of all or substantially all of the assets of the Company to a Covered Party, other than a Private Placement, including without limitation any Transaction in which the shareholders of the Company own less than a majority of the surviving entity or, in the case of a merger or sale with or to a shell company or a special purpose acquisition corporation (SPAC), irrespective of the resulting division of ownership;

g) the sale of a portion of the Company not defined as a Sale or Merger (a "**Divestiture**"), whether by merger, stock sale or sale in one or more transactions, of a portion of the

2

assets of the Company to a Covered Party;

h)   the sale of all or part of the Project to a suitable investor and/or operator of the Hospital
     or other purchaser.

### Description of Financial Advisory Services:

The Advisor will, to the extent requested by the Company, assist the Company in analyzing
potential Transactions according to the terms and conditions of this Agreement. In this regard,
the Advisor may undertake certain activities on behalf of the Company, including the following:

a)   analyzing Transaction options available to the Company;

b)   counseling the Company as to strategy and tactics for effecting a potential
     Transaction;

c)   advising the Company as to the structure and form of a possible Transaction,
     including the form of any agreements related thereto;

d)   assisting the Company in obtaining appropriate information and in preparing due
     diligence presentations related to a potential Transaction;

e)   introducing the Company to such Covered Parties as institutional investors,
     lenders, strategic or financial buyers, distributors, licensees, and/or strategic
     partners, as may be appropriate;

f)   assisting in negotiations related to a potential Transaction, as may be appropriate,
     on behalf of the Company; and

g)   rendering such other advisory services as may from time to time be agreed upon
     by the Company and the Advisor.

### Compensation for Corporate and Financial Advisory Services:

The Company paid and delivered to Advisor on May 20, 2011, the sum of $50,000 as the
Company's "**Initial Fee**" for its services under this Agreement. Within eight (8) weeks of
execution of this Agreement, Company shall pay to Advisor an additional sum of $50,000 as the
Company's "**Secondary Fee**" for its services under this Agreement. Upon the earlier occurrence
of the first draw of the Pre-Development Financing available to the Company or August 15,
2011, Company shall pay to Advisor an additional sum of $100,000 as the Company's "**Tertiary
Fee**" for its services under this Agreement. The Initial Fee, Secondary Fee, and Tertiary Fee shall
be deemed fully earned upon receipt, and nonrefundable. In addition, Advisor shall also be
entitled to additional fees and compensation as set forth in this Agreement, including for any
capital loaned for or invested in the Project by a Covered Party. Advisor shall not be entitled to
any fee in connection with the completion of the syndication for PHDC or a private placement
offering for Desert Cities Health Management Group, LLC.

C:\Documents and Settings\Administrator\My Documents\NASHDOCS-#825241-v7-Winners_Engagement_Letter.doc
N CWC1 825241 v7
2912746-000001 05/25/2011

## II. Real Estate Development Services:

In addition to the advisory services outlined above, Advisor shall also provide real estate development services described in this section.

### Project Development/Program Management Services under a "Turnkey Delivery Model":

As soon as practical after the date hereof, Advisor shall work with the company PHDC has contracted with to provide hospital development services, Healthcare Development Group, LLC ("HDG"), to prepare and maintain a list of steps to be taken for land acquisition, finance planning, entitlement objectives, overall site development strategy, lease or sale negotiations of the underlying lands and the physical improvements of the Hospital, capital structuring for the Project, together with a Master Development schedule for the completion thereof, which shall be attached hereto as <u>Exhibit B</u> and incorporated herein ("**Project Master Development Schedule**") within thirty (30) days of execution of this Agreement and shall be subject to the approval of the Company  The Project Master Development Schedule shall indicate the dates for the start and completion of the various stages of the Project, including the dates when information and approvals are required from the Company and including the Project date of substantial completion (the "**Completion Date**") of all of the services required to be performed to complete the Project (the "**Work**").  The Project Master Development Schedule shall be revised by Advisor as required by the conditions of the Project.  Throughout the planning, design, financing, equipping, construction and development of the Project, Advisor shall act, in close coordination with and at the direction of Company, as Company's key representative with respect to dealings with the Project lenders, partners, developer, architect, contractor, equipment suppliers, tenants and vendors, and HDG.  Without limiting the scope and description of services to be provided by Advisor as more fully described on Exhibit B, Advisor will provide the following services:

### Project Planning Services:

Upon final review of the operating procedures, staffing assumptions, and facility plan, Advisor will work with Company, the operator/management company selected by Company for the Project, and HDG to incorporate any comments and changes and refine the Single-Line Planning Documents ("SLPDs") accordingly prior to completion of architectural and engineering services. Advisor will work with the current and contracted architect of record for the project, Davis Stokes Collaborative, PC ("DSC"), and will work with the Project's current contracted development manager, HDG, whereby Advisor will act as the Company's representative in coordinating activities with the development manager, architect and the general contractor all under a turnkey development approach.  Advisor will review with Company all material construction documents submitted by the architect and development manager for review and recommendation by Advisor for Company's approval by stage of completion, along with invoices, bills, change orders (in excess of an agreed-upon amount) and other documents generated in connection with the Project.  Advisor will also coordinate all material ancillary required services directed by the development manager and architect , including but not limited

4

to soils testing, environmental testing, special testing, systems compliance requirements, utilities evaluation and analysis, and other services

Pre-Development Services

Advisor will assist Company in securing financing for all Pre-Development services for the Project which include all services required to receive issuance of the OSHPD permit and a Permanent Loan ("Pre-Development Services"). Advisor will introduce potential lenders to Company and its members and facilitate securing the Pre-Development Financing. For such services, Advisor shall be paid a fee pursuant to the attached schedule set forth on Exhibit C as a percentage of the total monies to be loaned for pre-development work to be paid at Closing of the Pre-Development Financing. In addition, the Advisor shall work with HDG during the pre-development period anticipated to not be shorter than eighteen months 18 months (the "Pre-Development Period") to coincide with the permitting process by OSHPD and provide certain pre-development services and oversee the work set forth in Exhibit B. The Advisor shall also be paid all of its reasonable Direct Reimbursable Expenses as such expenses are set forth and approved in the Pre-Development Budget approved by the company and Advisor. If such expenses are to exceed the expenses set forth in the budget, the Advisor shall receive the prior written approval from the Company. In addition, Advisor shall receive a fee amount equal to 3% of the Predevelopment costs which will be fixed upon completion of the approval of the total Pre-Development budget by Company and the lender (collectively, "Pre-Development Fee"). The Pre-Development Fee shall be set forth by Company and Advisor and incorporated into the Pre-Development Financing. The Advisor's Pre-Development Fee shall be paid to the Advisor, with the monthly amount based on the total projected Pre-Development Fee and dividing it by the months projected to completion of the pre-development period. The Pre-Development Fee shall commence upon execution of this Agreement and until the Pre-Development Financing is secured the Pre-Development Fee shall be accrued and the fee accrued prior to the Pre-Development Financing shall be paid at the closing of the Pre-Development Financing.

Compensation for Development Services:

    1.    Advisor shall facilitate securing permanent capital to provide necessary financing for the turnkey development of the Hospital with the expectation that a buyer would purchase the Property or Project upon completion of the pre-development work or sooner (the "Funding"). As part of this Agreement and as a condition of the transaction with the Hospital, Advisor shall be paid by Purchaser in the Hospital-Related Sale the following:

        (i)    If the Funding is provided by or the purchase is by a Covered Party, a fee as set forth in the attached Exhibit C, which fee is a percentage of the total financing provided for the development or purchase of the Hospital (the "Development Financing Fee"). Such fee will be paid at the applicable percentages set forth in Exhibit C corresponding to the incremental amounts of financing listed on such Exhibit. Such amount shall be paid to Advisor at Closing of the Funding;

(ii) A Project Management Fee for the development and delivery of the Project in an amount, calculated at 3% of the actual total final cost of the Project, plus reasonable direct and indirect overhead and reimbursable expenses. For purposes of this Agreement, reimbursable expenses shall be Advisor's reasonable out of pocket costs related to and necessary in connection with completion of the Project including direct and indirect overhead. These fees shall all be part of the overall total Project development budget. The Program Management Fee shall be billed by Advisor on a monthly or periodic basis proportionate to the percentage of work complete for each phase of the Project. The Project Management Fee shall accompany each draw approved by the architect of the Project and submitted to lender of the Permanent Loan for payment.

2.  In addition to the above referenced compensation for development services, at such time as the Company consummates a Hospital-Related Sale to a Covered Party or a party funded by a Covered Party, the Advisor shall receive an additional fee referred to herein as the Hospital development "Equity Equivalent Fee". This fee will be paid either directly by the Covered Party, a party funded by a Covered Party, or, if acceptable to the Advisor, by the Company after the proceeds of the Hospital-Related Sale are paid to the Company. This fee will be equal to thirty percent (30%) of the amount by which the net proceeds received by the Company as a result of the Hospital-Related Sale exceed all acquisition, development, construction and other costs incurred with respect to the Project through the date of the Hospital-Related Sale, including, without limitation, transaction costs, filing fees and attorney fees, but excluding this Equity Equivalent Fee due Advisor. The parties hereby acknowledge and agree that the remaining seventy percent (70%) of such excess amount will be paid to (or retained by) the Company in consideration for the risks associated with the development of the Project assumed by the Company and the Company's work in the development of the Hospital. This fee shall be paid at closing upon successful completion of the project and upon acceptance of title by the purchaser.

III. Other Matters:

Assignment:

It is contemplated that all of the rights, duties and obligations of the Company under this Agreement may be assigned by Company. It is agreed that such an assignment shall require the prior written consent of Advisor, which consent shall not be unreasonably withheld by Advisor. Upon the assignment of this Agreement, Physicians' Hospital of Desert Cities, LLC shall have no further obligations under this Agreement. Advisor shall not assign or delegate this Agreement, or any portion of this Agreement, without the prior written consent of Company.

Exclusivity:

The Company agrees that no other corporate or financial advisor is or will be authorized by it during the Term of this Agreement to perform corporate or financial services on the Company's behalf of the type described hereunder or other services which Advisor and the Company

6

otherwise agree will be performed by Advisor hereunder without the prior written approval of Advisor.    Notwithstanding the foregoing, Advisor acknowledges that the Company has employed other advisors, including legal counsel and HDG. No fee payable to any other financial, legal, or other advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Advisor, except as otherwise agreed to in writing by Advisor.  In order to coordinate our efforts with respect to a possible Transaction, during the period of our engagement hereunder neither the Company nor any representative thereof (other than Advisor) will engage in discussions, other than with HDG or Company's legal or accounting advisors, regarding a Transaction except with or through Advisor.   If the Company or its management receives an inquiry regarding a Transaction, it will promptly inform Advisor in writing of such inquiry.

Confidentiality:

The Company agrees that, without Advisor's prior written consent, it will not disclose, and will not include in any public announcement, the name or names of any investor, buyer, or strategic partner, unless and until such disclosure is required by law or applicable regulation, and then only to the extent of such requirement, unless the Company has received in writing approval from such investor, buyer or strategic partner.

The Advisor hereby acknowledges that Company will provide it proprietary information including, without limitation, strategic plans, financial data, know how, business plans, advertising plans, proprietary software and other confidential material (collectively, the **"Company Confidential Information"**).  The Advisor hereby agrees that for a period of five (5) years following Termination, it will not disclose any Company Confidential Information and shall only use such Company Confidential Information in order to perform its services to the Company as described in this Agreement.  The Advisor agrees to cause all of its representatives to abide by its confidentiality obligations hereunder and agrees to be liable to the Company for any failure by any of its representatives to abide by such obligations.  It is hereby agreed that "Company Confidential Information" does not include information which (i) generally becomes available to the public, or (ii) becomes available to the Advisor on a non-confidential basis from a source other than the Company so long as such source is not reasonably known to the Advisor to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation.

The Company hereby acknowledges that the Advisor will provide it proprietary information including, without limitation, strategic plans, financial data, know how, business plans, advertising plans, proprietary software and other confidential material (collectively, the **"Advisor Confidential Information"**).  The Company hereby agrees that for a period of five (5) years following Termination, it will not disclose any Advisor Confidential Information and shall only use such Advisor Confidential Information in connection with his Agreement.    The Company agrees to cause all of its representatives to abide by its confidentiality obligations hereunder and agrees to be liable to the Advisor for any failure by any of its representatives to abide by such obligations.  It is hereby agreed that "Advisor Confidential Information" does not include information which (i) generally becomes available to the public, or (ii) becomes available to the Company on a non-confidential basis from a source other than the Advisor so

7

long as such source is not reasonably known to the Company to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation.

Notwithstanding anything to the contrary in this Agreement, it is acknowledged and agreed that the knowledge and know how relating to the proposed Transaction is Advisor Confidential Information. The Company further agrees that the Advisor may share information relating to this Transaction to market its services and such sharing of information shall not be deemed a breach of this Agreement.

Closing:

The closing ("Closing") of a Transaction shall be deemed to occur on the earlier of the date of execution of all material legal documentation or the transfer (if applicable) of funds.  Any Closing is subject to documentation satisfactory to the Company and approval by the Company's Board of Directors.

Information Furnished by the Company:

The Company will furnish Advisor with all financial and other information and data as Advisor believes appropriate in connection with its activities on the Company's behalf, and shall provide Advisor full access to its officers, directors, and professional advisors and such employees as Company deems advisable. The Company agrees that it and its counsel will be solely responsible for ensuring that the Company's activities with respect to the Project and its present or future operations conducted by Company comply in all respects with applicable law.  The Company represents and warrants that any written or oral communication with Advisor at all times through Closing will not contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  The Company will promptly notify Advisor if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to Advisor.   The Company recognizes and confirms that Advisor, in connection with performing its services hereunder, (i) will be relying without investigation upon all information that is available from public sources or supplied to it by or on behalf of the Company or its advisors, (ii) will not in any respect be responsible for the accuracy or completeness of, or have any obligation to verify, the same and (iii) will not conduct any appraisal of any assets of the Company. The Company will also cause to be furnished to Advisor at the Closing copies of such agreements, opinions, certificates and other documents delivered at the Closing as Advisor may reasonably request.

Waiver of Conflicts:

The Company acknowledges that Advisor and its affiliates have and will continue to have relationships with parties other than the Company, pursuant to which Advisor may acquire information of interest to the Company.  Advisor shall have no obligation to disclose such information to the Company, or to use such information in connection with any contemplated Transaction.  The Company recognizes that Advisor is being engaged hereunder to provide the

8

May 25 11 03:28p     GA                                    7R    '0-8857              p.9

services described above only to the Company and to all other parties, if any, who execute this Agreement in specified other capacities and is not acting as an agent or a fiduciary of, and shall have no duties or liability to, the equity holders or members of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. No one other than the Company (and such other parties in such capacities, if any) is authorized to rely upon the engagement of Advisor hereunder or any statements, advice, opinions or conduct by Advisor. Upon termination of this Agreement (as defined in the "Termination of Agreement" section of this Agreement), the Company agrees to release Advisor with respect to the provision of future services to the Company or affiliates of the Company. Such services may include, but not be limited to, those described in this Agreement.

The Advisor acknowledges that Company and its affiliates have and will continue to have relationships with parties other than the Advisor, pursuant to which Company may acquire information of interest to the Advisor. Notwithstanding anything to the contrary herein, Company shall have no obligation to disclose such information to the Advisor, or to use such information in connection with any contemplated Transaction, provided however, that the Company shall disclose such information to Advisor if the information is relevant to Advisor's performance of its obligations under this Agreement.

## Termination of Agreement

This Agreement may not be terminated during the Term, except for "Cause" as defined herein. "Cause" shall exist, in the case of Company, if Company fails materially to comply with the terms hereof, including, but not limited to, a material failure to undertake the obligations imposed upon it hereunder or pursuant to other agreements in connection with the development of the Project, failure to cooperate with Advisor, or failure to pay to Advisor any sum required to be paid hereunder. In the case of Advisor, "Cause" shall exist if Advisor fails materially to comply with its obligations hereunder. In either case, the Agreement may not be terminated until (i) the party seeking to terminate the Agreement has given the other party not less than thirty (30) days' written notice specifying in reasonable detail the failure of such party giving rise to the asserted right to terminate; and (ii) the other party has been given a reasonable opportunity to cure such failure provided each party can show within ninety (90) days that it is taking all reasonable steps to cure any alleged breach and such breach shall be cured within a reasonable period of time. Upon the expiration of such period and cure opportunity, if the terminated party is the Company, then Advisor shall have no further obligation to perform services, but the Company shall be obligated to pay any and all amounts accrued to and through the date of termination. If the terminated party is the Advisor, then upon termination the Company shall have no further obligation to pay Advisor except with respect to amounts already due and payable under the Project Management Fee and Advisor shall have no further obligation to perform any further services. If the termination of Advisor for Cause occurs prior to the Closing of a Hospital-Related Sale, Advisor shall not be entitled to any portion of the Equity Equivalent Fee, but the Advisor shall be paid the Project Financing Fee in full. In the case of a termination hereunder, such party shall promptly return to the other party any and all property, drawings, and other materials that may have been provided to each other herein.

9

**Post-Termination Transactions:**

Notwithstanding anything to the contrary herein, if any Covered Party (or their respective affiliates) consummates a Transaction with the Company where Advisor is not the placement agent or financial advisor, at any time within twenty-four (24) months after the Termination for any reason or expiration of the Term, as extended, the Company agrees to promptly pay the Advisor those fees as described herein that are the responsibility of the Company.  A Transaction shall be deemed consummated before such date if the Company shall have entered into any definitive written agreement which includes material terms of such Transaction prior to such date even if the closing of such agreement occurs later.

**Attorneys' Fees Provision:**

In the event of any legal dispute between the Company and the Advisor, all reasonable attorneys' fees and related expenses of the prevailing party shall be paid by the other party (which shall include recovery of costs by the prevailing party and an award of interest at 10% per annum calculated from 30 days after the date a written request for such expenses is delivered by the prevailing party to the other party hereto until the date of payment).

**Governing Law and Jurisdiction:**

This Agreement is governed by and construed in accordance with the laws of the state of California without regard to choice of laws provisions.  All lawsuits, hearings, arbitration or other proceedings shall take place in Riverside County, State of California.   The parties irrevocably waive any objections they may have based on improper venue or inconvenient forum in such forum.

**Miscellaneous:**

It is understood and agreed that Advisor will act under this Agreement as an independent contractor with obligations solely to the Company and is not being retained hereunder to advise the Company as to the underlying business decision to consummate any Transaction or with respect to any related financing, derivative or other transaction. Nothing in this Agreement or the nature of our services shall be deemed to create a fiduciary or agency relationship between Advisor and the Company or its stockholders, employees or creditors, in connection with the Transaction or otherwise.  Other than as set forth in the indemnification provisions of this Agreement, nothing in this Agreement is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or related hereto. The Company agrees that Advisor shall not have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) in contract, tort or otherwise to the Company, or to any person claiming through the Company, in connection with the engagement of Advisor pursuant to this Agreement and the matters contemplated hereby, except where such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to

10

have resulted primarily and directly from the fraud, gross negligence, or willful misconduct of Advisor. The Company further agrees that Advisor shall have no responsibility for any act or omission by any of the Company's Representatives.

This engagement is with the Company only and no other party is intended as a third party beneficiary of the engagement letter.   Any communications with shareholders, members, directors, managers and/or partners of the Company are intended solely within their respective capacities as shareholders, directors/managers or officers of the Company and are not intended in their individual capacities.

**Indemnification:**

Recognizing that Advisor, in providing the services contemplated hereby, will be acting as representative of and relying on information provided by the Company, the Company agrees to protect, defend, indemnify and hold Advisor harmless against claims, losses, expenses, damages and other costs incurred by Advisor in connection with the services provided herein, in the absence of intentional misconduct or gross negligence on the part of Advisor or any of its representatives. The Company shall use reasonable efforts to cause any binding agreements with acquirers or providers of capital or financing to include exculpation and indemnification provisions in favor of Advisor which are equivalent to the foregoing and are binding on such persons. The Company shall be entitled, in its sole discretion, to defend any claim, dispute, lawsuit, investigation, arbitration, mediation or other proceeding that may trigger indemnification obligations hereunder (a "**Proceeding**"). In no event may the Advisor settle any Proceeding with a third party without the prior written consent of the Company.

**Severability:**

The provisions of this Agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement, in accordance with the terms hereof.  If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written.

**Counterparts:**

This letter may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this letter agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this letter agreement as to the parties and may be used in lieu of the original letter agreement for

C:\Documents and Settings\Administrator\My Documents\NASHDOCS-#825241-v7-Winners_Engagement_Letter.doc
N:CWC1 825241 v7
2912746-000001 05/25/2011

all purposes. Signatures of the parties transmitted by electronic transmission, including by facsimile and e-mail, shall be deemed to be their original signatures for any purpose whatsoever.

If this Agreement meets with the Company's approval, please indicate the Company's acceptance of the above by signing where indicated below and returning this Agreement by facsimile and the original by mail to the undersigned.

Thank you for the opportunity to be of service.

Sincerely,

Lee J. Plesaj
Manager
Winners Development Group 5, LLC,
a Nevada limited liability company

AGREED AND ACCEPTED:

The foregoing accurately sets forth our understanding and agreement with respect to the matters set forth herein.

PHYSICIANS' HOSPITAL OF DESERT CITIES, LLC

By: _Chair_

Name: _Gary Annunziata_

Title: _Chair_

Date: _5-25-11_

on unanimous agreement by the board of managers

U:\ATTORNEY\USCP\Winners Energy Group, LLC 5\NASHDOCS-#825241-v2-Winners_Engagement_Letter 051911.DOC

12

## EXHIBIT A

### Covered Parties

- National Standard Finance, LLC, and any affiliated or related parties.

- Royal Bank of Canada, and any affiliated or related parties.

- Balfour Beatty Construction, and any affiliated or related parties.

13

May  25  11  06:31p      GA                                      ˉ9   0-8857                    p.14

EXHIBIT B

PROJECT MASTER DEVELOPMENT SCHEDULE
[TO COME]

14

EXHIBIT C

Fee Schedule

Pre-Development Financing and Permanent Loan "Debt" (in Millions)

| Amount up to | Fee |
|---|---|
| Percentage payable on amount raised up to $25.0 | 4.0% |
| Percentage payable on next amounts raised over $25.0 but not over $100.0 | 3.5% |
| Percentage payable on next amounts raised over $100.0 but not over $200.0 | 3.0% |
| Percentage payable on next amounts raised over $200.0 but not over $300.0 | 2.5% |
| Percentage payable on next amounts raised over $300.0 | 2.0% |

15

EXHIBIT B

From: lploszaj@winnerscompanies.com
To: DOCGI@aol.com
Sent: 11/10/2011 10:03:58 A.M. Pacific Standard Time
Subj: Re: Confidential: draw request

Now it's Fred too! Saying we never agreed to spend all this money we were suppose to be funded by Oct
with the $25m now we gotta spend all this time and money chasing another process!

Everybody pissed at me! Say get us paid. We never agreed to all this. Fred said he hired Omalley in NY
full time to get this $25 placed.  He and Justin have been all over this!

Sent from my iPhone

On Nov 10, 2011, at 10:55 AM, "DOCGI@aol.com" <DOCGI@aol.com> wrote:

Should we get rid of brown? Keep stokes

In a message dated 11/10/2011 9:20:49 A.M. Pacific Standard Time, lploszaj@winnerscompanies.com
writes.
We have an issue everyone hates me! Got to get these guys paid. Willie, Jerry and Fred want to be paid!
Too much time money spent to date everyone going nuts on me.

I gotta keep this team I'm tack. Call me.
Sent from my iPhone

On Nov 10, 2011, at 7:15 AM, "DOCGI@aol.com" <DOCGI@aol.com> wrote:

Justin

Are we looking at using these funds prior to funding the predevelopment?

Gary

In a message dated 11/9/2011 10:55:09 A.M. Pacific Standard Time, jkolb@winnerscompanies.com
writes

Gary,

   Attached is a first draft of draw request #1 we'd like to discuss with you. Please let us know
when you are available for a call to discuss.

Thanks,

Justin

1

EXHIBIT C

From: fwagenhals@winnerscompanies.com
To: docgi@aol.com
CC: jkolb@winnerscompanies.com
Sent: 1/13/2012 9:49:23 A.M. Pacific Standard Time
Subj: RE: ?

Gary,
Step aside on helping raise the $25M if as you said you thought you could raise the $25M through your contacts before any of Winner's contacts could come through.
Fred

-----Original Message-----
From: docgi@aol.com [mailto:docgi@aol.com]
Sent: Friday, January 13, 2012 9:45 AM
To: Fred Wagenhals
Cc: Justin Kolb
Subject: Re: ?

Fred

Yesterday you told me you would "step aside" if I wanted you to , please address that

Sent from my iPhone

On Jan 13, 2012, at 7:43 AM, Fred Wagenhals <fwagenhals@winnerscompanies.com> wrote:

> Gary,
>
> We intend to abide by the terms of our contract and continue to assist in seeking Pre-Development Financing.  If you wish for us to not assist in this capital raise  please advise. As you know, we have launched numerous initiatives to raise this money including going to Hong Kong in hopes of finalizing  Francis Choi's  interest to participate.  If your wishes are different,  I will cancel my planned trip to Hong Kong.  As mentioned in my letter to you, the project  has had  difficulty in procuring the funds under the Doctor's Reg. D, which only expired in October.  Since meeting with UCSD on November 17th, we have taken a different approach to structuring the $25M  capital raise, and hope to generate better interest in the project.
>
> Fred
>
> -----Original Message-----
> From: Gary Annunziata [mailto:docgi@aol.com]
> Sent: Thursday, January 12, 2012 8:29 PM
> To: Fred Wagenhals
> Subject: ?
>
> Fred
>
> What is your vision of " stepping aside " as you said today
>
> Gary M. Annunziata D.O. FACP APC
> President Desert Gastroenterology Consultants President Advanced Gastro Technologies Inc.
> Chairman Of The Board Physicians Hospital Desert Cities L.L.C.
> Medical Director Mirage Endoscopy Center Former Chairman Department Of Medicine Eisenhower Medical Center Diplomat American Board of Internal Medicine Diplomat American Board of Gastroenterology

> 35900 Bob Hope Drive #275
> Rancho Mirage ,CA 92270
> 760-321-2500
> 760-321-5720fx
> http //www.desertgastro.net
> http //advancedgastrotechnologies.com/home.htm
>
>